378 F.3d 880
Terry Jess DENNIS, by and through Karla BUTKO, as Next Friend, Petitioner — Appellant,v.Michael BUDGE, Warden; Brian Sandoval, Attorney General of the State of Nevada, Respondents — Appellees.
No. 04-99003.
United States Court of Appeals, Ninth Circuit.
Argued (by telephone) and Submitted July 26, 2004.
Decided July 30, 2004.

COPYRIGHT MATERIAL OMITTED Michael Pescetta, Assistant Federal Public Defender, Las Vegas, Nevada, for petitioner-appellant.
Robert E. Wieland, Senior Deputy Attorney General, Reno, Nevada, for respondent-appellee.
Appeal from the United States District Court for the District of Nevada Philip M. Pro, Chief District Judge, Presiding. D.C. No. CV-S-04-0798-PMP.
Before: RYMER, BERZON, and CALLAHAN, Circuit Judges.
RYMER, Circuit Judge:

1
Karla Butko, a lawyer, appeals the district court's denial of her petition for writ of habeas corpus filed on behalf of her former client, Terry Dennis, a Nevada state prisoner, who is scheduled to be executed on August 12, 2004. She also asks for a stay of execution. The district court held that Butko lacks standing as Dennis's "next friend" and, consequently, dismissed the habeas petition. The district court also denied motions to proceed in forma pauperis, for appointment of counsel, and for stay of execution. The district court granted a Certificate of Appealability. We heard argument by telephone, and affirm dismissal of the petition. As Butko lacks standing, we also lack jurisdiction to stay the execution.

2
* Terry Dennis was charged with first degree murder in the Nevada state district court in Washoe County on March 29, 1999, and the State of Nevada filed a notice of intent to seek the death penalty on April 14, 1999.1 Dennis filed a guilty plea memorandum, was evaluated by a psychiatrist, was determined to be competent to stand trial, and entered a guilty plea. On April 16, 1999, the court found that Dennis understood the nature of the charges, the potential penalty of death, and was able to assist in his own defense. The court found that Dennis was competent to enter a guilty plea. At the penalty hearing, evidence was presented that Dennis suffered from mental illness — including bipolar disorder and post-traumatic stress disorder — that he had a long history of suicide attempts, and that he suffered abuse at the hands of his family. A three-judge panel sentenced Dennis to death. The Nevada Supreme Court affirmed the conviction and sentence. Dennis v. State, 116 Nev. 1075, 13 P.3d 434 (2000).

3
Dennis filed a petition for writ of habeas corpus in the state district court. Butko was appointed as habeas counsel on April 25, 2001. The state court dismissed the petition without an evidentiary hearing, and Dennis appealed to the Nevada Supreme Court. Before his appeal was heard, Dennis wrote letters to the state district court, the Washoe County District Attorney, and the Nevada Supreme Court expressing his desire to withdraw his appeal. The letter to the Nevada Supreme Court, dated September 9, 2003, stated that on September 4, 2003, "I met with Ms. Butko and informed her that I no longer wish to pursue any appeals and want my sentence to be carried out." However, on September 16, 2003, Butko filed an opening brief. Dennis then wrote the District Attorney on September 17, stating: "On 9-4-03 I informed Ms. Butko that I no longer wish to continue my appeals and I repeated the same to her on 9-16-03.... I don't know what I need to do to facilitate this so that's why I'm writing to you. Ms. Butko is doing all she can to delay things hoping I'll change my mind but I've been thinking this over for quite some time now and I assure you my mind's made up and I know what I'm doing." After receiving this letter, the District Attorney wrote to Butko that he assumed that she would move to dismiss the appeal because of Dennis's expressed desire. Butko responded that she would continue the appeal because she could not say Dennis is competent or "ready to make a knowing, intelligent and voluntary relinquishment of his right to appeal." The State filed a motion to remand the case to the state district court to conduct an evidentiary hearing to determine whether Dennis was competent to waive his appeal. On October 22, 2003, the Nevada Supreme Court granted the motion.

4
On November 7, 2003, Butko moved for permission to withdraw because Dennis's desire to waive his appeal and proceed to execution was so repugnant to her that she could no longer represent him. The trial court granted the motion and appointed new counsel.

5
The state district court also appointed a psychiatrist, Dr. Thomas E. Bittker. Bittker examined Dennis on November 24, 2003, reviewed records, interviewed counsel, and prepared a report. The report states that Dennis had a history consistent with Attention Deficit/Hyperactivity Type and had been diagnosed with Bipolar Disorder, Alcohol and Drug dependence, Post-traumatic Stress Disorder by history, and Mixed Personality Disorder with Antisocial Cyclothymic, Borderline, and Schizoid Features. It indicates that Dennis's "thoughts were focused, there was no evidence of tangentiality and circumstantiality." The report states that it is consistent with Dennis's pattern as a dependent man consumed by self-hatred that he "both killed the victim and is seeking the death penalty as a convenient way out of life, and a way of assuring himself that ultimately he will die."

6
In response to questions posed by the court, Bittker opined:

7
1. The defendant does have sufficient present ability to consult with his attorney with a reasonable degree of factual understanding.

8
2. The defendant has a rational and factual understanding of the proceedings. He is fully aware of the charges that he confronts, the implication of the sentence, and has a full understanding of what is involved in the death penalty. He is also aware of the legal options available to him and the consequences of his not proceeding with these options.

9
3. The defendant is currently taking medications that are reasonable and consistent with the diagnosis of Bipolar Disorder, and his primary psychiatric problems, alcohol, amphetamine, and cocaine dependence, are contained by virtue of the total institutional control in his life.

10
4. The medications that he is taking are not having any unusual effect on the defendant's ability to make decisions in behalf of his own interest, and to cooperate with counsel or to participate in the court hearing.

11
Having acknowledged all of the above, on the other hand, the defendant has sustained over years episodes of suicidal ideation, suicide attempts, and self-destructive behavior, which heralded both the instant offense and his current legal strategy. I believe, with a reasonable degree of medical certainty, that the defendant's desire to both seek the death penalty and to refuse appeals in his behalf are directly a consequence of the suicidal thinking and his chronic depressed state, as well as his self-hatred.

12
Clearly, an alternative to consider is whether or not the defendant's view of himself is simply a realistic incorporation of society's view of his "monstrous" behavior. On the other hand, it is conceivable and, in my mind, likely that both the defendant's offense and his current court strategy springs from his psychiatric disorder and his substance abuse disorder, that he wishes to die and he wishes to be certain of a reasonably humane death. Consequently, the death penalty, as provided by the state, is quite congruent with both his intent and his psychiatric disorder.

13
On December 4, 2003, the state district court conducted a hearing at which Dennis was present. The State and Dennis agreed that testimony was not necessary from Bittker. However, the court engaged in a comprehensive colloquy with Dennis.

14
Dennis testified that he hadn't attempted suicide or felt suicidal in prison, and had not attempted suicide since he started taking medication in 1995. The court had Dennis re-read his initial habeas petition to make sure there was nothing he wanted revisited and the court reviewed with Dennis the assignments of error alleged in the petition. Dennis asserted his desire to give up his right to pursue each of these claims. In response to the court's inquiry as to what Dennis wanted to happen in the case, Dennis stated "Well, I'm not sure what the process is step by step, but in the end without, without getting into a biblical standard of an eye for an eye or anything like that, basically, I took a life and I'm ready to pay for that with mine." Dennis stated he understood that by giving up his appeal the death penalty will be imposed, this was what he wanted to occur, he wanted to give up the right to a hearing on his appeal, he did not want an opportunity to have more time to prepare, and he had enough time to speak with his lawyers. Regarding his lawyers, Dennis stated "we have spent beau-coup time talking about this. Between him and Karla [Butko] they about browbeat me to death, but no, I'm staunch in my decision." Dennis repeatedly affirmed that he understood the proceedings, he had not been threatened or coerced in any way, he understood his decision and the consequences, and he wanted to give up his appeal.

15
Dennis's attorney, Scott Edwards, asked whether Dennis was giving up his appeal because he was unhappy with the prison conditions. Dennis said "no, the conditions aren't any worse than one would expect." Responding to the question why he changed his mind after filing the appeal, Dennis said he decided that he "would rather not live than to continue to live and be a doddering old man in prison." The court asked why Dennis had not attempted suicide in prison, and Dennis responded that his previous suicide attempts were always linked to alcohol, but this was not an issue in prison. Dennis also stated he was not having any auditory or visual hallucinations and he was able to understand the discussions. He affirmed that he understood the constitutional protections afforded all prisoners, he understood he was giving up those rights, there was nothing else he needed to do before making the decision, and he had no questions about his rights or his right to give up his rights. As he put it: "I think Mr. Edwards has explained about everything he can explain to me and so I'm cool as far as understanding and knowing what my options are and whatnot."

16
The court stated "I have done just about everything I can to talk you out of this, Mr. Dennis" — which Dennis acknowledged. The court then found that Dennis made a knowing, voluntary, and intelligent waiver of his rights and that his lawyers had attempted to dissuade him from his decision. It made detailed findings, both oral2 and written,3 that Dennis understood the nature of the proceedings he could pursue to avoid or delay imposition of the death penalty, that he has a rational and factual understanding of the legal proceedings, and that he does not suffer from any disease or mental defect that prevents him from making a rational choice among his options.

17
The Nevada Supreme Court directed Dennis's counsel to file a voluntary withdrawal of the appeal, which was done on February 2, 2004. On March 12, 2004, the Nevada Supreme Court held that substantial evidence supported the state district court's determination on Dennis's competency and granted Dennis's motion to voluntarily dismiss his appeal as knowingly and intelligently made.

18
The state district court issued a warrant of execution on May 17, 2004. The execution was set for July 22, 2004 at 9:00 p.m. but has since been rescheduled for August 12.

19
On June 14, 2004, Butko, represented by the Federal Public Defender, filed a "next-friend" petition for habeas corpus in the federal district court. In addition, on behalf of Dennis, Butko filed an application for leave to proceed in forma pauperis, a motion for appointment of counsel, and a motion for stay of execution. The state moved to dismiss the habeas petition, arguing that Butko lacked standing because she had not met her burden of showing that Dennis is incompetent, because she is not truly dedicated to Dennis's best interests, and because she does not have a significant relationship with Dennis.

20
On July 1, 2004, the district court held a hearing on the petition and the motions. Bittker testified that Dennis's "ready acquisition to the death penalty, to me, indicates a fulfillment of his desire, which I think is motivated by his depression, his desire to die.... And I think this is a direct consequence of his mood disorder." Asked whether the disease or defects prevents Dennis from making a rational choice between the options available to him, Bittker stated that he did not think that Dennis's choice was a "volitional decision," rather was "a fixed decision that has been sustained since the instant offense and before." Bittker testified that Dennis's "lack of ambiguity" and "almost obsessive insistence that he does die" is "not normal"; "I wouldn't call it delusional, but a fixed idea that must be fulfilled"; and is "not a product, necessarily, of rational thinking. It's the product of rigidity. And it is a product of his disorder." Bittker also said that he would have testified as he did before the federal district court if he had testified at the state court hearing.

21
The district court also engaged in a colloquy with Dennis. Dennis acknowledged that he was on his medication, said he understood the consequences of his actions, and confirmed that he had not changed his desire to drop all of his appeals. He indicated his understanding that he would be put to death by waiving further review. When asked whether he understood the manner in which the federal courts review convictions and death sentences, Dennis indicated that he didn't know how the "federal deal" works, and after having the procedure explained, Dennis said he understood but added that he did not "understand how someone could file motions without my consent to do something I'm against ... and having that even be considered." The court explained the "next friend" process, to which Dennis expressed his objection "in the extreme." He affirmed that it was his strong desire for the court not to take any action to stop or delay his execution as scheduled on July 22. Dennis said that he felt wholly competent to make rational decisions about his case and his execution. When asked why he wanted to drop his appeals and proceed with his execution, Dennis said that "death is preferable to another 15 or 20 years in prison." Finally, Dennis explained that he had not suffered from hallucinations, or felt suicidal, since he had been in custody, and so far as his bipolar disorder, suicidal ideation and depression are concerned, "I'm just fine."

22
On July 6, the district court granted the State's motion to dismiss and dismissed the action without prejudice for lack of standing. It found no issue that Butko is dedicated to Dennis's best interests and has a significant relationship with him. The court gave deference to the state-court findings pursuant to 28 U.S.C. § 2254(e)(1), and found that Butko did not rebut the presumption that those findings are correct. It noted that neither in his report nor testimony did Bittker state an opinion that Dennis was unable to make a rational choice among his options, and that nothing Bittker said or that the court's own canvass of Dennis disclosed showed by clear and convincing evidence that any of the state court findings was erroneous. Finally, the court noted that Butko proffered no meaningful evidence indicating that there had been any change in Dennis's condition since the state-court determination regarding his competence. It found "the understanding, rationality and overall competence of Dennis displayed at the extensive canvass conducted by this Court at the July 1 hearing, is quite congruent with the factual findings made by the state court which establish Dennis' competence within the meaning of Rees and Rumbaugh."4 The district court also found that the state court proceedings, while not adversarial, were a fair and effective means of resolving the question of Dennis's competence because the state considered all the evidence including the report of a state-appointed-neutral psychiatrist who examined Dennis and reported on his competence. In sum, it concluded that Dennis understands his position and the options available to him, and is able to make rational choices.

23
On July 6, 2004, Butko filed a timely notice of appeal as next friend. On July 7, 2004, the district court granted a Certificate of Appealability. On July 12, 2004, she filed a motion for stay of execution in this court.

II

24
A third party, or "next friend," may challenge the validity of a death sentence imposed on a capital defendant who has decided to forego his right of appeal only if she has standing.5 There are two "firmly rooted prerequisites" for "next friend" standing:

25
First, a "next friend" must provide an adequate explanation — such as inaccessibility, mental incompetence, or other disability — why the real party in interest cannot appear on his own behalf to prosecute the action. Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, and it has been further suggested that a `next friend' must have some significant relationship with the real party in interest.

26
Whitmore v. Arkansas, 495 U.S. 149, 163-64, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (citations omitted). The "burden is on the `next friend' clearly to establish the propriety of his status and thereby justify jurisdiction of the court." Id. at 164, 110 S.Ct. 1717; Brewer v. Lewis, 989 F.2d 1021, 1026 (9th Cir.1993). The first prerequisite — that the real party in interest is unable to litigate his own cause due to mental incapacity — "is not satisfied where an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed." Whitmore, 495 U.S. at 165, 110 S.Ct. 1717; Demosthenes v. Baal, 495 U.S. 731, 734, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990) (per curiam) (quoting Whitmore, 495 U.S. at 165, 110 S.Ct. 1717). This will be the case where, as in Whitmore, the prisoner's statements to the court demonstrate that he appreciates the consequences of his decision, that he understands the possible grounds for appeal but does not wish to pursue them, and that he has a reason for not delaying execution, and there is "no meaningful evidence that he was suffering from a mental disease, disorder, or defect that substantially affected his capacity to make an intelligent decision." Whitmore, 495 U.S. at 166, 110 S.Ct. 1717 (citing Rees, 384 U.S. at 314, 86 S.Ct. 1505).

27
We have often said that mental incompetency in the "next friend" context must meet the Rees standard, and must meet it, as Rees put it, in the "present posture of things." Miller ex rel. Jones v. Stewart, 231 F.3d 1248, 1250 (9th Cir.2000); see, e.g., Massie ex rel. Kroll v. Woodford, 244 F.3d 1192, 1196 (9th Cir.2001); Comer v. Stewart, 215 F.3d 910, 915 (9th Cir.2000); Vargas v. Lambert, 159 F.3d 1161, 1166 (9th Cir.1998); Brewer, 989 F.2d at 1025-26 & n. 4. Under Rees, when there is a question about a prisoner's mental competency to forego judicial proceedings, courts determine "whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises."6 Rees, 384 U.S. at 314, 86 S.Ct. 1505. Thus, "[t]he putative next friend must present `meaningful evidence' that petitioner is suffering from a mental disease, disorder, or defect that substantially affects his capacity to make an intelligent decision." Massie, 244 F.3d at 1196 (citing Whitmore, citing Rees).

28
* Butko argues that the standard of Rees and Whitmore is satisfied when the uncontradicted expert testimony shows that the inmate's decision to seek execution is directly a consequence of his mental illness. She maintains that more is required than for the inmate to have the intellectual ability to understand and appreciate his position; rather, he must be able to make the choice to abandon further litigation rationally, that is, without the decision being substantially affected by the mental disorder. Butko contends that both the state and federal courts ignored this uncontradicted evidence of Dennis's incompetence, and that in the face of it no rational court could find that he was competent.

29
First, we disagree that either court disregarded evidence that Dennis's decision was "directly a consequence" of his mental condition. The point was argued to both courts, and both rejected its significance.

30
We also disagree with Butko's premise. Evidence showing that a prisoner's decision is the product of a mental disease does not show that he lacks the capacity to make a rational choice. It is the latter — not the former — that matters. The question under Rees and Whitmore is not whether mental illness substantially affects a decision, but whether a mental disease, disorder or defect substantially affects the prisoner's capacity to appreciate his options and make a rational choice among them. Whitmore, 495 U.S. at 166, 110 S.Ct. 1717; Rees, 384 U.S. at 314, 86 S.Ct. 1505. A "rational choice" does not mean a sensible decision, or a decision that the next friend regards as reasonable. As the Supreme Court has pointed out, "[w]e have used the phrase `rational choice' in describing the competence necessary to withdraw a certiorari petition, but there is no indication in that opinion that the phrase means something different from `rational understanding.'" Godinez v. Moran, 509 U.S. 389, 398 n. 9, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (referring to Rees, 384 U.S. at 314, 86 S.Ct. 1505). Thus, Whitmore does not ask whether the prisoner's choice is rational, but whether he has the capacity to have a rational understanding with respect to continuing or abandoning further litigation. If the mental disease, disorder or defect does not substantially affect this capacity, then the prisoner is competent under Rees and Whitmore.

31
This accords with the Eighth Circuit's view in Smith v. Armontrout, 812 F.2d 1050 (8th Cir.1987), where a next friend made a similar argument that a prisoner under a sentence of death should not be allowed to waive his post-conviction remedies if there is any possibility that the decision is a product of a mental disease, disorder or defect. The court found this an unacceptable interpretation of Rees because it fails to allow for the possibility that a decision is substantially affected by a mental disorder but is in fact the product of a rational thought process.

32
Furthermore, we think it very probable, given the circumstances that perforce accompany a sentence of death, that in every case where a death-row inmate elects to abandon further legal proceedings, there will be a possibility that the decision is the product of a mental disease, disorder, or defect. Yet, Rees clearly contemplates that competent waivers are possible, and there is little point in conducting a competency inquiry if a finding of incompetency is virtually a foregone conclusion.

33
Id. at 1057 (citation omitted).

34
Here, there is no evidence that Dennis lacked a rational understanding of his position or that his capacity to make a rational choice was substantially affected by his mental condition. Bittker offered no such opinion.

35
Butko concedes that Dennis had the intellectual ability to understand his position, but contends that his apparent lucidity should not be taken for the ability to make a decision that is not dictated by his mental disorder. Instead, she submits, the staunchness of his decision itself shows that the decision is fixed, not volitional, and the state district court should not have substituted its own lay opinion for Bittker's professional opinion. However, the evidence does not compel the conclusion that Dennis's decision was fixed since before the murder. Dennis did not always desire to be executed; he appealed his conviction and sentence, and he filed a state habeas petition. He decided to forego his appeal from denial of that petition and to be executed rather than to grow old in prison. Bittker's report also indicates that Dennis's primary psychiatric problems were contained by medications and prison. Further, the fact that Dennis said he was firm in his decision simply shows that he was convinced of it, not that he lacked the capacity to make a rational choice. Finally, the state trial judge based her findings on Bittker's report as well as her extensive canvass of Dennis, and the fact that she had encountered Dennis numerous times in prior hearings and found no difference in competency from his plea hearing in 1999 to the hearing in 2004 overall supports the state court's findings.

36
Just as in Whitmore and Massie, in this case a state court conducted a hearing in which it found that Dennis had the capacity to understand his choices and knowingly and intelligently to waive his right to appeal, appreciated the consequences of his decision, understood the potential grounds for appeal, and did not suffer any mental disease or defect that prevents him from making a rational choice. Much like Dennis, the prisoner in Whitmore had explained that he would consider it "a terrible miscarriage of justice for a person to kill people and not be executed." 495 U.S. at 165, 110 S.Ct. 1717; see also Brewer, 989 F.2d at 1023 ("Brewer addressed the court at length, and said that he killed Rita Brier and that he believed execution was the only proper punishment for the premeditated murder of which he was guilty."). Also much like Dennis, the prisoner in Massie had suffered from a long history of mental illness (including being diagnosed as manic depressive), had attempted suicide, and was considered a severe suicide risk; similar to Dennis, he also did not wish to pursue remedies that at best would assure that he spent the rest of his life in prison. 244 F.3d at 1196. It was held in both cases that the prisoner was competent, and the next friend therefore lacked standing, because the prisoner was lucid, fully aware of his situation, understood the consequences of his actions, and there was no meaningful evidence that he had a mental defect that substantially affected his capacity to make a rational choice to abandon further litigation. Both cases would have come out differently if a decision that is the product of suicidal ideation or being manic-depressive satisfies the Rees and Whitmore standard.

B

37
In related points, Butko argues that the federal district court erred in applying the presumption of correctness to the state court finding that Dennis is competent to seek execution because the uncontradicted evidence that his decision is "directly a consequence" of his mental illness is clear and convincing, and because the state court proceeding that generated the unreliable finding was non-adversarial.

38
A state court's findings of fact are presumed to be correct. The applicant for habeas relief — in this case, the next friend — has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The federal district court applied this standard, as it must, and we agree with its conclusion that the state-court process was a fair and effective means of resolving the question of Dennis's competence and that Butko failed to present meaningful evidence of incompetency, or any evidence that shows that the state findings are incorrect.

39
Here, the state court appointed a well-qualified psychiatrist to examine Dennis and report his findings. Based on Bittker's report and the court's colloquy with Dennis, it found that Dennis was capable of assisting in his own defense, was capable of consulting with his counsel, understood the nature of the legal proceedings, had not been suicidal since his incarceration, and did not suffer from any disease or mental defect that prevented him from making a rational choice among his various legal options. A federal court may not overturn these findings unless they are not "fairly supported by the record." Baal, 495 U.S. at 735, 110 S.Ct. 2223 (noting that a state court's conclusion of regarding competency is entitled to a presumption of correctness). The state district court's findings in this case are fairly supported by the record, which included Dr. Bittker's report and the court's thorough canvass of Dennis. Both Bittker and the state trial judge found that Dennis had a rational understanding of the proceedings and his options and the consequences of his decision. Neither found that Dennis lacked the capacity to make rational choices. In short, there is no basis for overturning the state court's finding of competency.

40
The only new evidence since the state court's finding consists of Bittker's testimony, and another canvass of Dennis. The federal court canvass of Dennis was congruent with the state court's. Likewise, except in one respect, Bittker's testimony tracked his report and for the same reasons we have already indicated, his opinion is not meaningful evidence of Dennis's incapacity to make an intelligent decision. Bittker testified and wrote that Dennis's decision to forgo appeals is "directly a consequence of the suicidal thinking and his chronic depressed state," as well as his "self-hatred" and his "mood disorder," but Bittker offered no opinion — even when specifically asked — that Dennis's mental condition substantially affects his capacity to make a rational decision. The state court considered Bittker's opinion about Dennis's suicidal thinking and concluded that Dennis has not been suicidal for some time. The court found that Dennis's suicidal thoughts and attempts were always linked to drugs or alcohol, Dennis had no such problems in prison, and as Dennis put it, prison had "pretty much squared him away." Furthermore, evidence of suicidal ideation or attempts to commit suicide in the past is insufficient to demonstrate incompetency, see, e.g., Baal, 495 U.S. at 737, 110 S.Ct. 2223, and "is not enough to upset a current determination of competency," Massie, 244 F.3d at 1198. In Massie, the prisoner had been a victim of abuse as a child; had serious mental problems from childhood; was diagnosed as schizoid, manic depressive, schizophrenic; had contemplated suicide more than once and was considered a severe suicide risk. Despite this history of mental illness, the state court held that Massie was competent and we accepted those findings. Id. Finally, as we have explained, the fact that Dennis's decision may have sprung from past depression or suicidal thinking does not mean that a mental disease, disorder, or defect substantially affects his capacity presently to decide whether to forego appeals. As in Massie, where there was evidence that Massie's decision not to pursue an appeal was a "manifestation of Massie's suicidal wishes," id. at 1197, evidence that Dennis's decision is a direct consequence or product of suicidal ideation is not meaningful evidence of incompetency.

41
In his testimony (but not in his report), Bittker characterized Dennis's decision as "fixed" rather than "volitional." However, as we have discussed, this evidence does not clearly and convincingly demonstrate that Dennis is incompetent because Bittker found that Dennis has a rational understanding, that his primary psychiatric problems are contained, that his medications do not have any unusual effect on his ability to make decisions in behalf of his own interest — and because Bittker did not find that any problem substantially affected Dennis's capacity to appreciate his position or make rational choices. Even putting aside the state court's supported finding that Dennis is no longer suicidal, Bittker's opinion that Dennis's choice to seek execution is a product of his suicidal thoughts is circular and could be said about any death-row prisoner who withdraws an appeal. Although Bittker testified that he does not believe that anyone who wants to drop an appeal and be executed would be suicidal, Butko's argument that Dennis is incompetent because his decision is "directly a consequence of the suicidal thinking and his chronic depressed state" is essentially that Dennis is incompetent because Dennis's reason for choosing to die is that he wants to die. That was not Dennis's given reason for seeking execution, and does not meet the Whitmore test for next-friend standing. Dennis's reasons for seeking execution are that he took a life and is ready to pay for that with his own, he would rather die than be a doddering old man in prison, and "death is preferable to another 15 or 20 years in prison." Bittker's report and testimony do not state that Dennis's mental condition affects his capacity to make the decision, and there is no clear and convincing evidence that would support such a conclusion.

42
Nor are we persuaded by Butko's argument that the state court findings should not be presumed correct because the process employed was defective. In her view it was flawed because Bittker did not testify and the court ignored Bittker's conclusion that Dennis's decision was "directly a consequence" of his mental illness. She relies on Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir.2004), where we remarked that the fact-finding process itself could be defective if, for example, the state court were to make evidentiary findings without a hearing or giving the prisoner an opportunity to present evidence. However, neither happened here. Dennis, the state, or the judge could have called Bittker, but no one thought it was necessary. In any event, Bittker testified in federal court that his testimony would have been the same in state court, so we now have the benefit of knowing what that evidence would show. "[B]efore we can determine that the state-court factfinding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Id. at 1000. This we cannot say, given the careful way in which the hearing was conducted, the trial court's thorough exploration of Dennis's capacity rationally to understand what was going on and to decide what he wanted to do, and the evidence adduced in the federal court evidentiary hearing.

43
Butko also points to United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (addressing the Sixth Amendment right of an accused to have competent counsel in an adversarial criminal trial), and Barnett v. Hargett, 174 F.3d 1128, 1136 (10th Cir.1999) (concluding that findings from a competency hearing should not be presumed correct where the petitioner was effectively unrepresented). However, neither indicates that an expert who submits a written report must testify at a hearing to determine a prisoner's competency in order to make that proceeding adequate. We have previously rejected a similar argument. See Wells v. Arave, 18 F.3d 656, 658 (9th Cir.1994) (rejecting an argument that an absence of cross-examination of a psychologist rendered a state court hearing inadequate); see also Massie, 244 F.3d at 1195-97 (presuming a state court's competency findings correct where medical doctors provided reports). Courts clearly have a measure of discretion in affording a hearing that is suitable in the circumstances. See Rees, 384 U.S. at 314, 86 S.Ct. 1505. At the state court hearing in this case, Dennis's counsel offered Bittker's report, noted for the court the facts recited in it that Dennis took issue with, and explicitly stated that Bittker's testimony would not be needed. Counsel undertook to make sure that the record was made regarding the facts that had been developed and the legal standard that must be applied to determining Dennis's competency. Thus, unlike Barnett or Cronic, Dennis was not effectively unrepresented.

44
Butko's remaining contentions lack force. The state court did not fail to consider key aspects of the record, as we have already noted. The transcript of the hearing shows that the judge considered the paragraph in Bittker's report that states that Dennis's decision is "directly a consequence of the suicidal thinking and his chronic depressed state, as well as his self-hatred." However, the court found that Bittker's references to suicidal thinking and chronic depression were not supported from 1999 forward based on Dennis's testimony and the lack of any record of suicide attempts since 1995. As such, the state court considered and rejected the predicate that Dennis presently suffers from suicidal thinking or depression (at least so long as he is on medication, as he is). Butko also suggests that it was improper for the judge to make findings based on the judge's own lay observations.7 However, judges who have an opportunity to observe and question a prisoner are often in the best position to judge competency, especially as in this case, where the judge has had more than one opportunity to observe and interact with the prisoner. See Baal, 495 U.S. at 735-37, 110 S.Ct. 2223 (explaining that the trial court had the opportunity to witness and question the prisoner and was in a better position than a court of appeals to determine competence because the court of appeals did not personally observe the prisoner).

45
Accordingly, we conclude that there is no highly probative, overlooked or ignored evidence, central to the claim of incompetence, that is sufficient to "fatally undermine the state fact-finding process." See Taylor, 366 F.3d at 1001. Having also concluded that the state-court findings are presumptively correct, Butko's burden is to rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). She failed to carry this burden. Therefore, we conclude that Dennis's capacity to make the decision to forego appeals is not substantially affected by mental illness. This means that Butko has also failed to show that she is entitled to "next friend" status.

C

46
Given this disposition, we do not need to reach the State's arguments that Butko fails to meet the remaining prong of "next friend" standing because she withdrew from representing Dennis and is opposed to the death penalty, so she cannot be truly dedicated to Dennis's best interests, and because she is attempting to advance her own personal beliefs rather than her client's, thus belying a substantial relationship with him.

III

47
As Butko lacks next friend standing, we lack jurisdiction to issue a stay. See, e.g., Brewer, 989 F.2d at 1025 ("A grant of a stay is an exercise of judicial power, and we are not authorized to exercise such power on behalf of a party who has not first established standing."). Nor does any other basis for a stay appear. Cf. Vargas, 159 F.3d at 1171 (granting stay when next friend had presented new and meaningful evidence of deterioration in mental state since the last state competency hearing that required an evidentiary hearing). Consequently, we deny the request for a stay of execution.

48
AFFIRMED; REQUEST FOR STAY DENIED.

Notes:

1
A detailed description of the crime is found in the Nevada Supreme Court's opinion affirming Dennis's conviction and sentenceSee Dennis v. State, 116 Nev. 1075, 13 P.3d 434 (2000).

2
From the bench the court found:
The Court is persuaded that based upon my review of Dr. Bittker's report and based upon my history of working with Mr. Dennis in this case and his previous psychiatric evaluations that he was competent at the time he entered his plea, made a knowing, intelligent, and voluntary plea, and that he is competent to make decisions on his own behalf at this juncture.
Dr. Bittker's report, although interesting, seemed to address all matters in the alternative, and his reference to the suicidal thinking and chronic depressed state are not supported at least from 1999 forward. There is no record of any suicide attempt by Mr. Dennis since I have come to know Mr. Dennis. Certainly, depression would be a logical condition if one is facing the death penalty and death row.
But what is somewhat troublesome to the Court is Dr. Bittker seems to engage in an intellectual dialogue within this document of making alternative statements and global statements that date back to Mr. Dennis' childhood. The issue before the Court is to determine whether Mr. Dennis is competent at this juncture. He has already, the Court previously found him competent to enter a plea in 1999. We are now in 2004.
...
[T]he Court is persuaded that pursuant to Nevada law the Defendant has the sufficient ability to understand the nature of these proceedings, to assist in making rational and competent decisions regarding his right, his appellate rights and his right to pursue a writ in this case and that he is competent to make those decisions based upon the Court's global understanding of this case, the Court's previous involvement with the plea in this case of Mr. Dennis, and the many hearings that the Court has conducted with Mr. Dennis.
...
And Mr. Dennis has made it abundantly clear that he does not wish to pursue further appeal or the writ in this case, so for those reasons I accept this report, and I find based upon, again, my understanding of the entire file, my interactions with Mr. Dennis and a review of Dr. Bittker's report that Mr. Dennis is not suffering from a mental disability or defect which precludes him from making an informed decision in this case, assist his own defense, and understand the nature of these proceedings.

3
The written findings (issued December 22, 2003) concluded in relevant part:

10
The Court canvassed Dennis at length and accepts Dennis' representation that since he has been in prison he has not felt suicidal. However, Dr. Bittker notes in his report that Dennis experiences depression and suicidal thinking[;] Dennis disputes this representation. He acknowledges attempted suicide prior to 1995; however, he started taking medication in 1995, and has not attempted suicide since then nor has he made any suicide attempts while in prison. Based on Dr. Bittker's report and all other evidence before the court, the court finds Dennis does not suffer from any disease or mental defect that prevents him from making a rational choice among his various legal options — including whether to pursue any further litigation that may save his life. The Court finds Dennis is capable of assisting in his own defense and understanding the nature of legal proceedings he may pursue to avoid or delay imposition of the death penalty

11
Dennis was lucid during the court's canvass, and understood the court's questions and the purpose of the hearing. Dennis answered the court's questions with intelligence and insight. He denied experiencing any auditory or visual hallucinations. Dennis acknowledged receiving his medications as prescribed by the prison. Dennis was given an opportunity to ask questions of the court regarding his right to appeal and his right to any lifesaving form of relief whereby he might avoid the death penalty

12
Dennis continues to maintain he wants to die. Dennis states he is "staunch in [his] decision[ ]" and wants the death penalty imposed against him as soon as possible. He expressly desires to forego his appellate rights or any form of litigation that may result in any legal relief from the imposition of death. Dennis understands that even if he were unsuccessful in any present or future litigation, such litigation might delay imposition of the death penalty. Dennis nevertheless desires to waive even the opportunity of extending his life through continued, albeit possibly unsuccessful, litigation that might delay his execution

13
Dennis is aware of each and every claim for relief in his petition for writ of habeas corpus, and expressly desires to dismiss the petition and waive his appeal related to the petition. Dennis was advised he can renew his request for a hearing on his petition and the court will order a hearing. Dennis states that he "took a life and I'm ready to pay for that with mine." Dennis understands he has the right to continue with his appeal if he so desires. Dennis understands that by waiving his appeal the death penalty will be imposed. Dennis desires the death sentence he received to be imposed against him

14
Dennis has had sufficient time to consult with his attorneys regarding his desire to waive all litigation or forms of relief, including his appeal, and to proceed with his death sentence. Dennis understands that his counsel have done everything possible to this point to keep his legal options open for him. Counsel for Dennis have attempted to dissuade Dennis from waiving his appeal; counsel were prepared at all times to represent Dennis in any lifesaving litigation. The court finds, and Dennis personally agrees, there is no other information Dennis requires in order to supplement his decision to forego all litigation on his behalf. Dennis understands that if he continues to pursue his appeal or other forms of relief, his life might be spared

15
Dennis knows how to read and write. No one has threatened Dennis or made any promise to him in his decision to waive all further litigation. Dennis understands that by waiving his appeal, the penalty of death is irreversible. Dennis understands that by waiving his appeal, any issues that were or could have been brought in the appeal are forever waived, and that his death would presumably be carried out without further delay or intervention. The Court has ordered Mr. Scott Edwards to continue his representation of Dennis and advised Dennis he may contact Mr. Edwards for any legal advice before imposition of the death penalty

16
The Court has considered Dr. Bittker's report, Dennis' responses to the court's canvass, and the totality of the circumstances. The court finds Dennis is competent to waive his appeal and any other form of legal relief by any means that might spare his execution. Dennis has sufficient present ability to consult with his attorney with a reasonable degree of factual understanding, and he has a rational and factual understanding of the legal proceedings. The court finds that Dennis has voluntarily, knowingly, and intelligently waived his right to pursue further forms of relief that might save his life, including his right to appeal in CR99P0611, Supreme Court Case No. 41664

4
Rees v. Peyton, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), and Rumbaugh v. Procunier, 753 F.2d 395, 398 (5th Cir.1985). As set out in Rumbaugh, the Fifth Circuit breaks the Rees standard into three questions:
(1) Is the person suffering from a mental disease or defect?
(2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?
(3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?
If the answer to the first question is no, the court need go no further, the person is competent. If both the first and second questions are answered in the affirmative, the person is incompetent and the third question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative; if yes, the person is incompetent, if no, the person is competent.
We have never done this, relying instead on the actual Rees formulation, but Rumbaugh as well as Rees has been referred to more or less interchangeably throughout these proceedings.

5
We review standing issues de novoSee Gospel Missions of Am. v. City of Los Angeles, 328 F.3d 548, 553 (9th Cir.2003). Likewise, we review the dismissal of a habeas petition de novo. See Forn v. Hornung, 343 F.3d 990, 994 (9th Cir.2003). The standing of a next friend is a jurisdictional issue, which is reviewed de novo.

6
The parties quibble to some extent over whether theRees standard for competence to waive appeals in a capital case differs from the test for competence to stand trial as articulated in Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him"). However, we see no reason to resolve whether there is any difference because we have consistently used the Whitmore and Rees standard in next-friend cases, and the outcome here would be the same in any event.

7
Citing Lafferty v. Cook, 949 F.2d 1546, 1555 (10th Cir.1991) (stating that the expert testimony in that case indicated that "the physical demeanor of a person suffering from a paranoid delusional system sheds no light on the extent to which his defense decisions are driven by a deluded perception of reality" and that illness is difficult to recognize by lay people); Strickland v. Francis, 738 F.2d 1542, 1552 (11th Cir.1984) (stating that a jury cannot arbitrarily ignore expert testimony in favor of lay observation where "the expert testimony so clearly and overwhelmingly points to a conclusion of incompetency"); Lokos v. Capps, 625 F.2d 1258, 1267-68 (5th Cir.1980) (explaining that testimony of "lay witnesses" at a hearing to determine competency to stand trial "was not of value because they had lacked prolonged and intimate contact with Lokos").

49
BERZON, J., concurring in the judgment.

50
The issues in this case deal with the core of the human condition, and not only because the ultimate issue is one of life or death. When, if ever, can it be said that an individual is making a decision of the greatest consequence of his own free will, rather than a decision determined by a mental infirmity from which he suffers? Indeed, how can a mental infirmity or disorder be distinguished from the myriad of memories, experiences and genetic predispositions that go to make up each individual's unique personality? We as judges and lawyers attempt to capture these philosophical dilemmas in words that can have very different meanings to different people, and that often may not respect the concepts that mental health professionals would use to capture cognitive and volitional capacity. See Kansas v. Hendricks, 521 U.S. 346, 359, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ("The legal definitions of `insanity' and `competency' ... vary substantially from their psychiatric counterparts.").

51
I begin with these reflections because, while I agree with the majority's conclusion that the district court's next friend determination should be affirmed, I do not agree with the route the majority takes to reach that conclusion. In particular, while the majority purports to observe the standard articulated by the Supreme Court in Rees v. Peyton, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966) (per curiam), the substance of the opinion is not faithful to that representation. Rather, the majority opinion appears to be based on a vision of mental processes which precludes the possibility that an individual with intact cognitive capacity may, nonetheless, be unable to make a rational choice, not so much because the choice is not rational in an objective sense, or because the individual in general lacks the capacity to make rational choices, but because, for the person making the particular decision it is not a choice. Instead, the individual's mental disorder dictates the outcome. As I read Rees, it requires that where the defendant is seeking immediate execution and thereby precluding any later reconsideration of the legality of the proceedings leading to that end, there is a separate inquiry required that focuses on such volitional rather than cognitive aspects of the defendant's mental makeup.

I.

52
The majority's account of the background of this case is comprehensive and basically accurate. I add only a few additional facts: First, the three-judge panel that sentenced Dennis to death found that his mental illness was a mitigating factor with regard to his penalty, albeit not one sufficient to override (along with another mitigating factor, that he was under the influence of alcohol when he committed the crime) the aggravating factors.

53
Second, the state habeas petition was pending for more than two years. The state trial court never ruled on most of the issues raised, instead dismissing the petition without ever offering findings of fact or conclusions of law to explain its decision. The appeal of the denial of the habeas petition therefore sought only a remand for determination of the issues raised. It was at that juncture — having waited for more than two years for a ruling that never materialized and now facing additional delay at the trial level if the appeal succeeded — that Dennis changed his mind about pursuing his state habeas remedy and sought to withdraw his appeal.

54
Third, the state trial court's original referral of the competency issue to Dr. Bittker specifically contemplated that Dr. Bittker would be called to testify at the competency hearing. At the first hearing following the remand order from the Nevada Supreme Court, the court told Dennis's counsel:

55
[A]dvise the witness or the doctor that the Court will conduct an evidentiary hearing, so the doctor will, likewise, be required to come to court and give testimony, and he'll be subject to cross-examination by Mr. Edwards, by the State and by the Court so that a thorough record is available for the Supreme Court.

56
When the hearing was held and Dr. Bittker's report was introduced, the parties who advised the state trial judge that her original plan to hear testimony was unnecessary were the state and Dennis, both of whom were seeking a ruling of competence rather than incompetence. At the same time, the state trial court judge expressed confusion at the competency hearing over the meaning of Dr. Bittker's report, troubled by Bittker's seeming "intellectual dialogue within [the report —] making alternative statements and global assessments that date back to Mr. Dennis' childhood." The prosecutor also was not clear what Dr. Bittker meant ("I'm not sure what ... Dr. Bittker is saying. I'm not sure what it means when he says the Defendant's desire to both seek the death penalty and to refuse appeals are directly a consequence of the suicidal thinking and his chronic depressed state."), and specifically suggested that, depending on the standard applied, it might be that Dr. Bittker "has to come in here, he has got to testify, he has got to be under oath, and he has got to be cross-examined." Dr. Bittker was not, however, called to testify at the state competency proceedings.

57
Fourth, although the medical records do not show any suicide attempts after 1995, they do show that Dennis went to the Veterans's Administration hospital several times in the year before the murder for medical care to alleviate his acute psychiatric symptoms, including suicidal ideation.

58
Fifth, Dennis offered at the state trial court competency hearing some factual corrections to Dr. Bittker's report. Although the court simply accepted these corrections and thereby the implication that Dr. Bittker's report was inaccurate in several respects, a reading of earlier hearings and Dennis's medical and criminal records indicates that Dr. Bittker's report was basically accurate.1

59
It is critical to my ultimate conclusion that even though, for reasons that will appear, I regard the competency hearing in the state trial court as procedurally inadequate in some respects, the majority is entirely correct in its portrayal of Dennis's own testimony and presentation: The record reflects, and appellant Butko recognizes, that Dennis was lucid, clear, unwavering, and thoughtful when canvassed about his decision. In particular, Dennis maintained that his medication and lack of access to alcohol while in prison had alleviated his suicidal thoughts and curbed his symptoms of depression. Dr. Bittker does not specifically refute this representation, either in his report or in his later federal court testimony. Thus, the state court's findings numbered 11 through 15, which appear on pages 10-11 of the majority opinion, are fully supported by the record and entitled to deference under 28 U.S.C. § 2254(e)(1), as interpreted in Taylor v. Maddox, 366 F.3d 992 (9th Cir.2004), whatever may be the case regarding the state court's interpretation and weighing of Dr. Bittker's report.

60
Finally, as my conclusion ultimately turns largely on the federal habeas hearing, some additional aspects of that hearing, and of the district court's ruling, bear noting:

61
Dennis was canvassed at length by the district court judge. Once again he was definite, lucid, thoughtful, and engaged. He took several opportunities to stress the firmness of his decision, stating that he "can't state ... strongly enough" his desire to end all legal proceedings, and "welcome[s]" the execution then set for July 22. Dennis also acknowledged hallucinations in the past, due to a "history of really chronic alcohol and drug abuse" — "I couldn't describe to you some of the things I've seen and heard" — but denied, twice, any such hallucinations since he was in custody and had no access to alcohol or drugs. Dennis also maintained that his suicidal thoughts in the past had been linked to his drug and alcohol abuse, and that as to depression, while "I think everyone who is locked up can tell you a little bit about depression, ... whether they are loony or not," "I do not suffer from depression" since being treated.

62
Dr. Bittker's testimony was generally as recorded in the majority opinion, but bears a bit more examination in light of the majority's expressed understanding of that testimony in its opinion, with which I disagree. In addition to the remarks recorded by the majority, Dr. Bittker said that Dennis:

63
• "[S]uffers from a very significant bipolar disorder, ongoing I believe, ... which colors his judgment."

64
• "[H]as rather significant intellectual insight into what's going on with him."

65
• Makes "some remarks [that] are self-serving toward his own end, which is, I think, a longstanding commitment to die."

66
• "[M]ostly ... has a core identity that says he's not worth much, he deserves to die."

67
• Is "[a]bsolutely not" "demented ... delirious [or] psychotic."

68
One colloquy in particular, between the district court judge and Dr. Bittker, bears transcribing in full, as the majority places great reliance on it.

69
The Court: Does the condition, the disease or defects that you find in Mr. Dennis, do those conditions, in your opinion, prevent him from making a rational choice regarding the options that are available to him; to choose either to waive appeals and go forward with execution three weeks hence, or to pursue appeals for whatever purpose they may avail him, for good or for bad down the road?

70
[Dr. Bittker]: Your honor, let me acknowledge this. There is nothing in the diagnosis, the DSM-IV diagnosis about bipolar type II disorder that talks about fixed suicidal ideation. We do acknowledge that suicidal ideation is a component of depression. Mr. Dennis's behavior for the past several years, prior to and including the instant offense, begins with the fixed idea that he deserves and wants to die.

71
The Court: Right.

72
[Dr. Bittker]: I see that as a product of the uniqueness of Mr. Dennis, but a product of a mental disorder. His thinking and his behavior springs from his mood. It doesn't spring from the interaction with the environment. There is nothing that this court is going to do that will dissuaded [sic] him from the way that he insists on dying because he deserves to die. And it isn't as he necessarily represents, an issue of the law of "an eye for an eye." It's an issue that he believes that he is worthless and deserves to die and wants to die. It's the one power that he has. He has no other power in his life other than to determine his desire for death.

73
The Court: And in your judgment, is that, is he capable of volitionally making a rational decision in that regard?

74
[Dr. Bittker]: I believe in this case, this is the one area where I don't think it is a volitional decision. I think it's a fixed decision that has been sustained since the instant offense and before.

75
Finally, when asked whether "you believe that this position on his part is in fact a product of his mental disorder," Dr. Bittker answered, "Yes."

76
In its written opinion, the district court used the standard adopted by the Fifth Circuit in Rumbaugh v. Procunier, 753 F.2d 395, 398 (5th Cir.1985).2 The district court then applied the 28 U.S.C. § 2254(e)(1) presumption of correctness to the state court findings. Additionally, the district court rejected the argument that the state court competency hearing did not comply with constitutional due process standards. However, the district court, as I read its opinion — and this point is for me ultimately determinative — went on to make an independent finding regarding Dennis's competence at the time of the federal court hearing, applying the Rumbaugh standard:

77
[T]he understanding, rationality and over all competence of Dennis displayed at the extensive canvass conducted by this Court at the July 1st hearing, is quite congruent with the factual findings made by the state court.... In sum, Dennis understands his legal positions and the options available to him, and he is able to make rational choices.

II.

78
My central quarrel with the majority's substantive approach is that while the majority recognizes that this court has consistently applied the standard articulated by the Supreme Court in Rees v. Peyton,3 to "next friend" standing issues in the context of capital cases, it declines to elucidate coherently the meaning of that standard. Instead, at some points — albeit not at others — the majority waters down the "rational choice" aspect of that standard so that it has no independent role whatever. After quoting, for example, from Godinez v. Moran, 509 U.S. 389, 398 n. 9, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), the majority maintains that it "does not [matter] whether the prisoner's choice is rational, but whether he has the capacity to have a rational understanding with respect to confirming or abandoning further litigation." Maj. Op. at 890; see also Maj. Op. at 890 ("Evidence showing that a prisoner's decision is the product of a mental disease does not show that he lacks the capacity to make a rational choice.").

79
I simply do not understand this reasoning. If a "next friend" establishes that a prisoner's mental disorder determinatively programmed his decision regarding whether to seek to avoid execution, then any purported "choice" to forego legal proceedings is illusory. In effect, such a prisoner, though otherwise lucid, rational and capable of making reasonable choices is, in a Manchurian Candidate-like fashion, volitionally incapable of making a choice other than death when faced with the specific question here at issue — namely, whether to pursue legal proceedings that could vacate the death penalty or to abandon them. If so, I don't know what it means to say that he retains the capacity to make a rational choice. To make a "choice" means to exercise some measure of autonomy or free will among the available options, at least to the degree that an individual who does not suffer from a mental disorder is able to do so.4

80
Unlike the majority, I do not understand Judge Arnold's persuasive analysis in Smith ex rel. Mo. Pub. Defender Comm'n v. Armontrout, 812 F.2d 1050 (8th Cir.1987), to say anything about the reach of Rees inconsistent with my understanding. Rather, Smith was addressing an argument made in that case that the Rees standard is satisfied if there is only a "possibility that the decision is the product of a mental disease, disorder, or defect." Id. The language of the brief Rees opinion does state, as one half of the articulated standard, that the pertinent question is whether the prisoner suffers from "a mental disease, disorder, or defect which may substantially affect his capacity" to make rational choices. 384 U.S. at 314, 86 S.Ct. 1505 (emphasis added). But, as Smith cogently concludes, to give literal meaning to this language is to disregard the context of the sentence in which it appears. The first part of the same sentence states a standard that is definite rather than speculative — "whether [the prisoner] has capacity to appreciate his position and make a rational choice." Id. As Smith states, to avoid a conflict between the two disjunctive halves of a single sentence, and also to avoid a standard that could as a practical matter preclude any death-row inmates from finally abandoning legal proceedings, it makes much more sense to read Rees as requiring an actual, demonstrated inability to make rational choices because of a volitional impairment that is the product of a mental disorder. Smith, 812 F.2d at 1057.

81
It is to make clear that we are adopting, not rejecting, the Smith analysis that I would explicitly adopt the three-prong approach articulated in Rumbaugh, which is fully consistent with the analysis in Smith (as Smith notes). See id. Rumbaugh sets out a three-prong approach:

82
(1) Is the person suffering from a mental disease or defect?

83
(2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

84
(3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

85
753 F.2d at 398.

86
The final Rumbaugh prong makes explicit, first, that a mental disorder "which does not impair the cognitive function but impacts only on the volitional [function]" can render a death-row prisoner incompetent finally to waive to all further legal proceedings, id. at 399, and second, that this volitionally-focused prong is determinative only if it actually "prevents" a rational choice.

87
To me, both aspects of the Rumbaugh/Smith implementation of Rees are critical. An expressed desire to abandon all judicial review and proceed to certain death by execution necessarily raises questions about the competency of the person who requested such a course of action. Nevertheless, as Judge Kozinski has explained, an important principle should guide the legal system's treatment of individuals:

88
[W]hether we who administer the law will treat ordinary mortals with the candor and respect they deserve as human beings. There is, I suggest, something worse than being tried and punished for one's crimes, and that is being treated by our legal system as less than human, a thing to be manipulated, supposedly for one's own good.

89
United States v. Kaczynski, 262 F.3d 1034, 1035 (9th Cir.2001) (Kozinski, J., dissenting from denial of rehearing en banc). Legal competence inquiries necessarily place emphasis on honoring the autonomy of an individual who has expressed desire for a recognized treatment within the system, while at the same time assuring that the individual retains sufficient autonomy as to the decision at issue that his choice should be respected.

90
The "rational choice" analysis, as mandated by Rees, better serves autonomy interests than competency standards that consider only basic cognitive understanding.5 Failure to ascertain whether a capital defendant has reached the decision to waive further judicial review because of a mental disorder, even though he generally retains the ability to make rational choices, might credit a decision that does not represent the decision he would reach if he were able to implement a real choice, free of mental disorder.

91
In the context of capital sentence review, this form of competence is particularly important, because an incompetent prisoner's objection deprives the state of an opportunity to pursue litigation designed to "enhance `the accuracy of capital sentencing.'" Beard v. Banks, ___ U.S. ___, 124 S.Ct. 2504, 2514-15, 159 L.Ed.2d 494 (2004) (quoting Sawyer v. Smith, 497 U.S. 227, 244, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990)). More importantly, a decision to waive further review will ensure the prisoner's execution, regardless of the potential success of claims of constitutional error.

92
As compared to the competency standard for entering a guilty plea, established by Johnson v. Zerbst, 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the Rees requirement that a capital defendant has the ability to make a "rational choice" accounts for the irrevocable permanency of the decision. Even if a capital defendant enters a guilty plea, an action that has both substantive and procedural consequences, later considerations or revelations may occasion review of the plea. For example, in post-conviction review or on direct appeal, a capital defendant might argue that he received ineffective assistance of counsel when he entered the plea, or that the state court erroneously determined that he was competent to enter the plea, or that information has turned up indicating prosecutorial misconduct.6 In contrast, the decision to waive post-conviction review of alleged constitutional errors stemming from proceedings that concluded in the issuance of a death warrant is a permanent procedural waiver, with no opportunity for rescission. Adding to other competency inquiries consideration of the ability to make such an irrevocable choice accounts for the manner in which this decision differs from others.

93
I stress that the autonomy concerns just outlined support both aspects of the Rumbaugh standard: First, a separate focus on volitional, as opposed to purely cognitive functioning, which the majority in this case appears to abjure at critical junctures; and second, a narrow realm for that volitional inquiry, so as not to swallow up the right of death row prisoners to control their own destiny, except when their mental disorder so predominates their decisionmaking as to "prevent" any choice but accepting execution. The second factor is, in my view, as important as the first, and assures that a volitional inquiry does not give way to the circular assertion that, as the majority deridingly puts it, "Dennis is incompetent because Dennis's reason for choosing to die is that he wants to die." Rather, only when a person in Dennis's situation is not in any meaningful sense choosing to die, whatever his articulated reasons, because his mental disorder prevents him from making alternative choices, should the independent "rational choice" inquiry preclude a finding of competence.

III.

94
Measured by this standard, I would hold that Dr. Bittker, in his testimony if not in his written report, did state that in his view, Dennis was not capable of making a rational choice other than to abandon his challenges to the death penalty, given his bipolar disorder. The written report, I would agree, is somewhat unclear on this question. That report states "with a reasonable degree of medical certainty" that Dennis's decision was "directly a consequence of the suicidal thinking and his chronic depressed state, as well as his self-hatred." That statement, standing alone, most probably indicates that the decision was dictated by one of Dennis's mental disorders, described earlier in the report (most probably bipolar disorder, Type II), but the association is not explicit. Presumably, one could exhibit suicidal thinking, chronic depression (especially if one's external circumstances are depressing, as is serving on death row), and self-hatred without suffering that disorder. The report itself goes on to so indicate, stating that "the defendant's view of himself" could be "simply a realistic incorporation of society's view of his `monstrous' behavior." Up to that point, then, the report maintains that Dennis's choice may be based on realistic considerations, but almost surely is not.

95
The report then goes on to say only that it is "conceivable" and "likely" that the decision "springs from his psychiatric disorder and his substance abuse disorder." As noted, I would not accept the mere possibility that a decision is volitionally dictated by a mental disorder as sufficient, given the competing autonomy interests of an individual who is not in fact sufficiently impaired that he is making no meaningful choice among his options.

96
Finally, the report concludes with a summarizing statement: "Consequently, the death penalty, as provided by the state, is quite congruent with both his intent and his psychiatric disorder." (emphasis added). This summary can be read to indicate that Dennis does have an independent, ascertainable intent, quite aside from the psychiatric disorder, suggesting that the disorder does not prevent him from making rationally the choice to forego legal appeals that could delay or vacate the death sentence.

97
Recalling that (1) Dr. Bittker was suggested as an appropriate, respected expert, and appointed, by the court, not by any party; (2) Dr. Bittker was told at the outset that he would be testifying, so there was no reason fully to explain himself in his report; and (3) there was no party at the state competency hearing forwarding the proposition that Dennis was not competent to make the rational choice to forego further legal appeals and choose to accept execution, I would hold that the state court did not sufficiently inquire into the only available expert testimony to make a reasonably defensible final decision on the "rational choice" prong of the Rees/Rumbaugh standard. We do not have to decide here whether there should have been an appointment of an amicus or other party to present that point of view, as has often occurred under similar circumstances, see, e.g., Mason ex rel. Marson v. Vasquez, 5 F.3d 1220, 1221 (9th Cir.) aff'd 1 F.3d 964 (9th Cir.1993) (en banc); Comer v. Stewart, 230 F.Supp.2d 1016, 1019 (D.Ariz.2002), or whether inquiry of Dr. Bittker by the existing parties and the judge would have been sufficient. Neither happened. The result was that the state trial court really had no way of knowing precisely what Dr. Bittker meant, but necessarily proceeded upon assumptions about what he meant, after noting that the report was less than clear.

98
Under these circumstances, and in the absence of any competing expert testimony, I disagree with the panel's holding that the state court's ultimate factual findings on the critical "rational choice" aspect of competency (unlike those underlying findings concerning Dennis's presentation and lucidity during the state court proceedings) were adequate to trigger deference under 28 U.S.C. § 2254(e)(1).7 As we recently explained in Taylor v. Maddox, 366 F.3d 992 (9th Cir.2004) factual determinations are governed by § 2254(e)(1) only if it is first determined that, intrinsically, the state court's factual determination was not unreasonable.8 Taylor, 366 F.3d at 1000. Further, a state court factual determination can be unreasonable if "the fact-finding process itself is defective." Id. at 1001. While the majority concludes that that is not the case here, I disagree. I would hold, instead, that "any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Id. at 1000. Given the importance of expert evidence in evaluating mental health questions in general, see United States v. Finley, 301 F.3d 1000 (9th Cir.2002) (reversing conviction because district court wrongly excluded expert testimony); see also, e.g., Shafer v. Bowersox, 329 F.3d 637, 649-51 (8th Cir.2003) (focusing on centrality of expert testimony); Wilkins v. Bowersox, 145 F.3d 1006, 1014-15 (8th Cir.1998) (same); Levine v. Torvik, 986 F.2d 1506, 1513-14 (6th Cir.1993) (same), overruled in part on other grounds by Thompson v. Keohane, 516 U.S. 99, 111, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), and as it relates to competence to waive the final legal challenges in a death penalty case in particular, special care is needed in developing and evaluating such testimony. To conclude that a defendant is competent when the only, court-appointed expert does not testify although he expected to do so; is not subject to adversarial presentation; and submits an ambiguous report that on some interpretations may indicate incompetence in compliance with the applicable legal standards, is simply not an adequate fact-finding process. I would therefore hold that, with regard to the weight to be given to Dr. Bittker's opinion — and therefore with regard to the final determination whether Dennis is capable of making a rational choice to forego his legal challenges to his execution — the state court factual findings should not be presumed correct, and need not be disproven by clear and convincing evidence (as § 2254(e)(1) requires if applicable), in this federal habeas proceeding.

99
But that is not the end of the matter. For the district court did hold an evidentiary hearing; that hearing was adversary with respect to Dennis's competence, as the putative next friend, Karen Butko, was represented by counsel and had to prove Dennis's incompetence to stay in court; and Dr. Bittker did testify at that hearing, with full direct and cross examination. Although I read Dr. Bittker's testimony at the district court hearing as considerably clearer with respect to his opinion that Dennis's mental disorder prevented him from making a rational choice to forgo further legal proceedings and accept execution than was his written report, I would hold that the district court was entitled to, and did, weigh his testimony, against the federal district court's and state trial court's own assessments of Dennis's competence, each after interviewing Dennis at length; that the district court did make an independent fact finding regarding Dennis competence at the time of the federal court hearing, which is the controlling question with regard to Butko's next friend status; and that the district court's fact finding must be upheld unless clearly erroneous, which it is not.

100
More specifically: The content of Dr. Bittker's testimony at the federal court hearing is summarized in the majority opinion and further amplified above. Dr. Bittker testified that Dennis suffers from bipolar II disorder, entailing a "primary mood state of depression," which is a chronic condition, like hypertension or diabetes, that doesn't go away. His illness is "very significant" and "colors his judgment." (emphasis added). Dennis does, in Dr. Bittker's view, have "rather significant intellectual insight into what's going on with him," although "some of his remarks are self-serving." His "desire to die" is "motivated by his depression," and the decision to have "the state become his vehicle for suicide" is "the direct consequence of his mood disorder." His "fixed idea" that "he does die" is "a product of his disorder." When directly asked for a determination, in the language of Rumbaugh, whether "those conditions ... prevent him from making a rational choice regarding the options that are available to him," Dr. Bittker concluded that Dennis's decision is "a product of a mental disorder," that it "springs from his mood" and not "from the interaction with the environment," and that "this is the area where I don't think it is a volitional decision." Asked whether "this decision on his part is in fact a product of his mental disorder," Dr. Bittker answered, "[y]es."

101
Were I the factfinder, I would read this sequence of responses as meeting the Rees/Rumbaugh standard with regard to the inability to make a rational choice. To say (three times) that a decision is "a product of his mental disorder," and is not volitional, is to my mind indistinguishable from saying that his mental disorder prevents him from making any other choice.

102
So, for me, the determinative question becomes the following: Was the finder of fact — here, for all the reasons I have surveyed, the federal district court, deciding without deference to the state trial court with regard to the assessment and weighing of Dr. Bittker's testimony — entitled to conclude, despite that testimony, that Dennis was in fact able to make a rational choice to choose to abandon his claims that constitutional errors infected his Nevada state court proceedings. As a general matter, finders of fact can disbelieve uncontested expert testimony and rely on other, conflicting evidence in the record. See, e.g., United States v. Woodson, 526 F.2d 550, 551 (9th Cir.1975) (per curiam); Cont. Connector Corp. v. Houston Fearless Corp., 350 F.2d 183, 188 (9th Cir.1965). Where there is uncontested expert testimony regarding a defendant's psychological state, the rule is undoubtedly the same, although I have not been able to find a Ninth Circuit case so holding.

103
At the same time, as the Eleventh Circuit held some time ago in a well-reasoned opinion, where there is uncontested expert testimony of incompetency, a finder of fact "cannot arbitrarily ignore the experts in favor of the observations of laymen." Strickland v. Francis, 738 F.2d 1542, 1552 (11th Cir.1984). Instead, the factfinder must have some basis for disregarding the expert, such as:

104
"(1) the correctness or adequacy of the factual assumptions on which the expert opinion is based;

105
(2) possible bias in the experts' appraisal of the defendant's condition;

106
(3) inconsistencies in the expert's testimony, or material variations between experts; and

107
(4) the relevance and strength of the contrary lay testimony."

108
Id. (quoting Brock v. United States, 387 F.2d 254, 258 (5th Cir.1967)).

109
Applying Strickland's standards, which I find illuminate the inquiry, I would conclude that the district court did not clearly err, despite Dr. Bittker's testimony, in finding that Dennis's mental disorder does not prevent him from making a rational choice to give up his state habeas appeal and accept execution.

110
As to the correctness of the factual assumptions upon which the expert's opinion was based, Dr. Bittker cleared up at the federal court hearing some of the asserted factual errors that the state court had found. The district court did not note the correction of these errors, instead apparently relying upon the state court's erroneous assessment. None of those asserted errors, however, are of any particular significance to Dr. Bittker's final conclusion, or to a factfinder's assessment of them. Thus, while I would hold that the federal district court clearly erred in accepting the state court's factfindings regarding whether, for example, Dr. Bittker was correct about Dennis's prior convictions and his family history, I do not see how this mistake infected the ultimate assessment of Dennis's competence.

111
There is, as the majority notes, one major respect in which Dr. Bittker's testimony does not square with the factual record: Although Dr. Bittker maintained that Dennis has "for the past several years" harbored an idee fixe regarding the necessity of his death that is rigid, resolute, and not ambivalent, in fact Dennis himself filed, pro se, a state court habeas petition, allowed counsel to be appointed to pursue that petition, and permitted the habeas litigation to continue on for several years. Nothing in Dr. Bittker's report or testimony accounts for these actions, or explains how they comport with Dr. Bittker's understanding of the connection between Dennis's mental disorder and his position regarding further appeals.

112
Second, the state's cross-examination of Dr. Bittker at the federal hearing implicitly accused him of bias. Although Dr. Bittker was originally appointed as a neutral expert, he was retained at the federal hearing by Butko, the putative next friend, and the state brought out on cross-examination that he had discussed with Butko's counsel the Rees standard. Dr. Bittker testified that Butko's counsel,

113
pointed out that my last several paragraphs where I talked about how I viewed Mr. Dennis' decision to be a product of chronic and ongoing suicidal thinking, might qualify, according to the Rees decision.... In that sense, we have just taken my initial report and allowed this court to hear that vis-a-vis Mr. Pescetta's perspective in the Rees decision.

114
So, no, it wasn't tailored. I don't think anything has fundamentally changed in that report. It's pretty much the same thing I said in November of 2003.

115
In my view, the district court was entitled to view this testimony as suggesting some bias toward meeting the Rees standard, and also as undermining the greater clarity of the testimony at the hearing as compared with the report. As noted, that report was ambiguous, and could be read as not meeting the Rees/Rumbaugh standard. By stating that he was just saying the same thing again, and indicating that any change in language was a conscious attempt to come closer to the legal standard, Dr. Bittker to some degree weakened the fairly conclusive evidence he had given on direct examination — or at least the district court was entitled so to conclude.

116
Third, the district court could, as discussed above, have viewed Dr. Bittker's testimony at the federal court hearing as somewhat inconsistent with — or at least different in tone and focus from — his written report, justifying somewhat less reliance on the clarity of his statements at the hearing than would otherwise be the case.

117
Finally, and most importantly, the lay evidence here was not, as in Strickland, the observations of interested third parties about events outside the courtroom, but two judges's own observations, after lengthy canvassing of Dennis, regarding the connection between his mental disorder and his choice to forego further legal proceedings that could delay or prevent his execution. In particular, Dennis maintained that since being in prison, his medications had helped him bring his mental disorders under control, in that he was no more depressed than other prisoners and no longer had suicidal thoughts or hallucinations. Especially as Dr. Bittker did not specifically testify otherwise, only characterizing Dennis's mental disorder as chronic, the district court was entitled both to rely on the state court's findings in this regard and to make his own finding crediting Dennis's representations.9 Further, the lucidity and awareness of Dennis's testimony in both courts and his well-stated objections to interference with his decision by third parties were entitled to considerable weight. Also entitled to consideration was the fact that Dennis was able to articulate reasons for his decision — primarily, that he deserved to die and, perhaps more convincingly, that, at the age of 58, he did not want to grow old in prison (with the implication that he would do so even if the conviction were eventually overturned and he was re-tried, which could take many years before all appeals were completed).10

118
None of these considerations, in my view, would compel a district court finding that Bittker's testimony was not adequate to prove Dennis's volitional competence under the Rees/Rumbaugh standard. On balance, however, were I the federal district judge, I would probably have concluded that Dennis is volitionally as well as cognitively competent, and is therefore entitled to make an autonomous decision regarding his fate.

119
The hardest question for me is whether the district court in fact made this determination, independent of the state trial court's conclusion regarding whether Dennis's mental disorder prevented him from rationally choosing to forego his appeal, or whether we should return the case to the district court to allow him to decide the volitional competence issue without regard to the state trial court's conclusion. Reading the district court's opinion carefully, however, I believe that court, in the penultimate substantive paragraph of its written opinion, looked independently at the question of Dennis's competence at the time of the district court hearing, relying primarily on "the understanding, rationality and overall competence Dennis displayed at the extensive canvass conducted by this Court at the July 1 hearing" as well as on his perception that, at the July 1 hearing, Dr. Bittker "avoided providing an opinion in the terms of the third Rumbaugh inquiry." The court's conclusion, stated at that juncture (although not at others) without specifying deference to the state trial court, was that, "[i]n sum, Dennis understands his legal position and the options available to him, and he is able to make rational choices." As that conclusion is not clearly erroneous, I would affirm the district court, albeit for reasons entirely different from those relied upon by the majority.

Notes:

1
First, Dr. Bittker's report stated that "[Dennis] has no memory of [his] biological mother, but does report that [his] biological mother and her relatives were heavily involved in alcohol and drug abuse." Dennis's counsel informed the court that "[Dennis had no] recollection or knowledge about ... heavy use of alcohol or drug abuse by the relatives of his biological mother." This assertion contradicts Dennis's report to the court during his 1999 joint arraignment and competency hearing. The colloquy between the court and Dennis at that hearing follows:
The Court: And was there anyone in your family who suffered from mental health issues?
[Dennis]: Not that I know. I mean, I was pretty young, you know. But there was a lot of alcoholism.
The Court: And who suffered from the alcoholism?
[Dennis]: A lot of uncles, a lot of relatives. And I guess my mother, my biological mother, was alcoholic. She died of tuberculosis. But she used to escape from the sanitarium, go downtown, pick up sailors and get drunk.
In fairness, it is unclear whether Dennis refers to relatives of his adopted family or biological family in this colloquy. However, under either interpretation, Bittker's report does not materially misrepresent Dennis's family history as to require an amendment striking the portion that notes alcoholism within the family.
Second, and more significantly, Dennis's objection appeared broadly to deny Dr. Bittker's representations concerning auditory and visual hallucinations. Dr. Bittker wrote: "The defendant states that he is `okay' on these medications, but does acknowledge occasional auditory and visual hallucinations." This sentence might be read in two ways: Dennis occasionally hallucinated within a short period of time before Dr. Bittker conducted the interview, or Dennis hallucinated occasionally during some unknown period in the past. The objection that Dennis launched could easily be interpreted as a challenge to the proposition that Dennis ever suffered from auditory or visual hallucinations. However, his medical records indicate that he reported a history of hallucinations to mental health professionals at different times within four years of his arrest.

2
As I shall explain, I would expressly adoptRumbaugh's analysis as well.

3
Every other circuit to address the question has also continued to applyRees to next friend and competency issues in the context of final withdrawal of legal proceedings by capital defendants. See, e.g., Mata v. Johnson, 210 F.3d 324 (5th Cir.2000); Ford v. Haley, 195 F.3d 603 (11th Cir.1999); O'Rourke v. Endell, 153 F.3d 560 (8th Cir.1998); Franklin v. Francis, 144 F.3d 429 (6th Cir.1998); In re Heidnik, 112 F.3d 105 (3d Cir.1997).

4
I qualify the statement so as to avoid centuries of debate about the degree to which any of us in truth exhibit autonomy or free will. Of course, the theory of autonomy that the law embraces will confound scholars indefinitelySee generally Jessica Wilen Berg, Understanding Waiver, 40 Hous. L.Rev. 281, 286 n. 19, 290-91 & n. 42 (2003) (discussing, alternatively, theories of autonomy offered by philosophers Rawls, Mill, and Kant)

5
Some scholars have described a continuum of decisional competency that ranges from "basic rationality" to "reasoned choice."See Christopher Slobogin, Rethinking Legally Relevant Mental Disorder, 29 Ohio N.U. L.Rev. 497, 519-21 (2003); Christopher Slobogin & Amy Mashburn, The Criminal Defense Lawyer's Fiduciary Duty to Clients with Mental Disability, 68 Fordham L.Rev. 1581, 1597-98 (2000); cf. Paul S. Appelbaum & Thomas Grisso, Assessing Patients' Capacities to Consent to Treatment, 319 New. Eng. J. Med. 1635, 1636 (1988) (describing a "reasoned choice" standard in the medical context); Jessica Wilen Berg et al., Constructing Competence; Formulating Standards of Legal Competence To Make Medical Decisions, 48 Rutgers L.Rev. 345, 357 (1996) (same).

6
Dennis argued in his state habeas petition that constitutional errors infected the entry of his guilty plea

7
Massie ex rel. Kroll v. Woodford, 244 F.3d 1192 (9th Cir.2001) (per curiam) and Wells ex rel. Kehne v. Arave, 18 F.3d 656 (9th Cir.1994) (per curiam) do not require a contrary result. Massie simply did not address the adequacy of the district court hearing with regard to the experts' failure to testify. See Massie, 244 F.3d at 1198. In Wells, the court found that the state court hearing was adequate even though the expert had not testified, but nothing in the expert's report suggested that the prisoner was incompetent. Wells, 18 F.3d at 658.

8
The district court in this case thought 28 U.S.C. § 2254(d) inapplicable to the present circumstances, as that section is limited to "any claim adjudicated on the merits in State court proceedings." The majority, however, assumes that theTaylor analysis, which depends upon the applicability of the "unreasonable determination of the facts" requirement of § 2254(d)(2), does apply, and I agree. I fail to understand in what sense there was not a merits determination here. The state court did decide on its merits, as opposed to not deciding or dismissing on a procedural ground, the claim that Dennis was incompetent to waive his state habeas appeal. That determination is entitled to deference on the next friend issue under Demosthenes v. Baal, 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990) (citing Maggio v. Fulford, 462 U.S. 111, 117, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983)).

9
To say that someone has a chronic condition is not to say that it is symptomatic at any particular time. Diabetes and hypertension, the two examples Dr. Bittker used, are both chronic conditions, but both can be contained by medication so that they are not symptomatic

10
Of course, all of the reasons that Dennis offers for seeking death would not merit consideration if our system disallowed consent to execution. However, as the Supreme Court made clear when it allowed Gary Gilmore to proceed to a Utah firing squad, although there were "substantial questions ... about the constitutionality of the Utah death penalty statute,"Gilmore v. Utah, 429 U.S. 1012, 1017-18, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976) (White, J., dissenting), we are required to allow capital defendants to give knowing, voluntary, and intelligent waivers to potentially lifesaving review.