**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILLIAM KIRKPATRICK, JR., *Petitioner-Appellant*, | No. 14-99001 |
| | D.C. No. 2:96-cv-00351-WDK |
| v. | |
| KEVIN CHAPPELL, Warden, California State Prison at San Quentin, *Respondent-Appellee.* | OPINION |

Appeal from the United States District Court
for the Central District of California
William D. Keller, Senior District Judge, Presiding

Argued and Submitted February 17, 2017
Pasadena, California

Filed October 10, 2017

Before: Stephen Reinhardt, Alex Kozinski,
and Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Kozinski

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel vacated the district court's order dismissing for lack of exhaustion claims in William Kirkpatrick, Jr's habeas corpus petition challenging his murder conviction and death sentence, and remanded to the district court so that it may adjudicate those claims on the merits.

The district court dismissed the claims as unexhausted on the ground that, although Kirkpatrick presented them to the California Supreme Court, he subsequently waived them by means of a handwritten, pro se filing. The California Supreme Court ruled that the handwritten form constituted a valid waiver despite the conclusion of the referee it appointed that there was not enough evidence that the waiver was made knowingly, voluntarily, and intelligently. The district court agreed with the California Supreme Court.

The panel held that there is insufficient evidence in the record to support a finding that Kirkpatrick's handwritten form constituted a valid waiver of his right to proceed and that the State of California failed to carry its burden to the contrary. Consequently, the panel held that the district court erred in dismissing the claims as unexhausted.

Dissenting, Judge Kozinski wrote that the majority failed to defer to the California Supreme Court whose findings are supported by more than enough evidence, and that under de

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

novo review Kirkpatrick would fare no better, but that none of this matters because California has no functional death penalty.

**COUNSEL**

Patricia A. Young (argued) and Mark R. Drozdowski, Deputy Federal Public Defenders; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Robert C. Schneider (argued), A. Scott Hayward, and Jaime L. Fuster, Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

**OPINION**

REINHARDT, Circuit Judge:

William Kirkpatrick, Jr., was convicted of murder and sentenced to death in California more than thirty years ago. His case has followed a long and complicated procedural path to this court. He now appeals the district court's dismissal of certain claims for relief in his federal habeas corpus petition. He contends that the district court was wrong to dismiss those claims as unexhausted and should instead have adjudicated them on the merits – something that has not yet happened in any court, state or federal.

The district court dismissed the claims as unexhausted on the ground that, although Kirkpatrick presented them to the California Supreme Court, he subsequently waived them by means of a handwritten, pro se filing. The California Supreme Court ruled that the handwritten form constituted a valid waiver despite the conclusion of the referee it appointed that there was not enough evidence that the waiver was made knowingly, voluntarily, and intelligently, as the Constitution requires. The district court agreed with the California Supreme Court.

We conclude that there is insufficient evidence in the record to support a finding that Kirkpatrick's handwritten form constituted a valid waiver of his right to proceed and that the State failed to carry its burden to the contrary. Consequently, we hold that the district court erred in dismissing the claims as unexhausted. We remand the case to the district court so that it may adjudicate the claims in question on the merits.[1]

## I. BACKGROUND

### A.

In September 1983, two men were murdered at a Taco Bell in Burbank, California. Both victims, who worked at the restaurant, were shot in the head point blank. Police soon arrested and charged Kirkpatrick with the double murder. He was 23 years old at the time.

---

[1] Kirkpatrick also appeals the dismissal of one other claim that was admittedly exhausted, but for reasons we explain below, we do not reach that claim here.

In the three decades in which Kirkpatrick's case has been pending in various courts, he has repeatedly tried to represent himself or to interfere with his defense when represented by counsel and has repeatedly expressed dissatisfaction with and distrust of his lawyers. Shortly after the State brought charges against him, the trial court appointed two lawyers, two psychiatrists, and an investigator to assist in Kirkpatrick's defense. Kirkpatrick, however, requested that he be appointed as co-counsel for purposes of the trial.[2] He also insisted on proceeding to trial quickly – even after another possible perpetrator, Eddie Salazar, was arrested in connection with the same crimes. A few weeks after voir dire, Kirkpatrick sent a letter to the court criticizing his attorneys' performance. The lawyers explained that they were having problems with their client, whose desires clashed with their legal advice.

The State's theory of the case at trial was that Kirkpatrick stole a .22 caliber gun from a Union 76 gas station, and used it to murder the Taco Bell employees several days later, with the help of Salazar, his co-conspirator. The prosecution also said that Kirkpatrick told acquaintances about the crime after it had been committed.

To support this theory, the prosecution called 42 witnesses. Several testified that they saw Kirkpatrick with a gun that looked like the murder weapon in the days before the shooting. One witness testified that he saw Kirkpatrick and Salazar together shortly before the shootings, and another witness testified that he saw the two men, with a gun, immediately afterwards. The prosecution introduced evidence of bullets found in Kirkpatrick's car, and car stereo

---

[2] This request was denied.

equipment that had allegedly been stolen from the Union 76 gas station.  The prosecution also entered the .22 caliber gun – the supposed murder weapon – into evidence, although the firearms examiner could not be sure that that particular weapon had fired the bullets collected at the crime scene.

Kirkpatrick testified in his own defense, despite counsel's advice that it was not in his best interest to do so.  He discussed his location the night of the crimes, and said that he had intended to visit a friend in Whittier but was not able to do so because his car battery died.  He said that he purchased a new car battery in the early morning following the time at which the shootings occurred and then slept in a motel.  The defense's three other witnesses corroborated his whereabouts at several points in time, but did not provide any concrete alibi.  Kirkpatrick's lawyer conceded that whoever committed the crimes committed first degree murder, and apologetically told the jury that lawyers "deal with . . . facts as best they can."

The jury deliberated for five days and, during their deliberation, asked for a read-back of the testimony of four witnesses.  The jury found Kirkpatrick guilty on all counts and found true all death-qualifying special circumstances. During the jury's deliberations, the court received another letter from Kirkpatrick complaining about his lawyers; he said that he no longer considered them his attorneys.

**B.**

Kirkpatrick asked to represent himself at the penalty phase of the trial – the proceeding at which the jury would decide whether to sentence him to life with the possibility of parole, or to death.  The court denied Kirkpatrick's request on

the grounds that his request was untimely and that there was no overwhelming reason for the court in its discretion to allow Kirkpatrick to proceed pro se. The court nevertheless granted him co-counsel status when he threatened not to appear unless he could proceed pro se. The court asked about his letter and complaints against his attorneys, and Kirkpatrick said that at some points the lawyers "went completely against everything [he] requested," including requests to subpoena witnesses that were ignored. His lawyers did not dispute these claims.

To support a sentence of death, the prosecution presented evidence of Kirkpatrick's troubling past actions as aggravating circumstances. The defense's mitigation presentation took place the same day, and consisted solely of Kirkpatrick's brief testimony, in which he simply reasserted his innocence and said that he was from New York and aspired to be a writer.

Beyond that, the defense essentially prepared no case for mitigation at the penalty phase. The lawyer and investigator spoke to only one person, Kirkpatrick's mother, in preparation for their presentation of mitigating evidence. They believed that she would be "very, very helpful to the defense," but she was never called to testify. This may have been at Kirkpatrick's insistence, as he instructed his lawyers not to interview or present any family members as witnesses. Kirkpatrick also stated that he did not want any of his family members brought to court or even contacted at all, and the investigator did not interview any of Kirkpatrick's other family members or friends. Although his lawyers stated that Kirkpatrick should be evaluated psychiatrically, Kirkpatrick said that he did not want to meet with a psychiatrist, and the court "accept[ed] Mr. Kirkpatrick's position on that." In any

event, no evidence of Kirkpatrick's difficult upbringing, his disadvantaged social background, his history of mental health problems and drug abuse, or his relationships with friends and family was ever presented to the court or even investigated by the defense team.

All that Kirkpatrick said in his closing statement was that he had not received a fair trial. He said that his attorneys failed to call certain witnesses and failed to ask specific questions. He said he was "frightened" and "mad" that prosecutors were sending an innocent person to jail. He also told jurors that he did not blame them for finding him guilty and that he would have done the same thing if he had been in their position.

The prosecution replied that Kirkpatrick was "an anarchist," and that "[h]is contribution to society has been pain, suffering, and misery." It said that "the circumstances in aggravation far outweigh any circumstances in mitigation, if any" and that the jury could impose a sentence of life without parole, rather than a sentence of death, only if it ignored the aggravating factors.

Two days after the jury began its penalty selection deliberations, it returned a death verdict for both murders. The court proceeded to hold a sentencing hearing at which it reviewed the aggravating and mitigating circumstances and found that the only mitigating factors were the defendant's lack of prior felony convictions and his young age. It sentenced Kirkpatrick to death.[3]

---

[3] Kirkpatrick's supposed co-conspirator, Eddie Salazar, was also convicted for his participation in the Taco Bell crimes and was later sentenced to two concurrent terms of 25 years to life.

## C.

Kirkpatrick filed a direct appeal in the California Supreme Court and a state habeas petition claiming penalty phase ineffective assistance of counsel. The California Supreme Court affirmed Kirkpatrick's conviction in a lengthy opinion. *People v. Kirkpatrick*, 874 P.2d 248 (1994). It also summarily denied the habeas petition, although two of the justices voted to grant relief for penalty phase ineffective assistance.

Kirkpatrick later filed a federal habeas petition in the Central District of California raising numerous claims for relief. This time, he was represented by Federal Public Defenders rather than the lawyers appointed by the state court. The district court found that a number of the claims in the federal petition had not been exhausted in state court. Accordingly, it stayed consideration of the petition to permit Kirkpatrick to return to state court. Kirkpatrick then filed a petition in the California Supreme Court raising the claims that the district court had found to be unexhausted; he presented more than twenty such claims.

A year and a half later, while his petition was pending in the California Supreme Court, Kirkpatrick sent that court a letter and attached a handwritten document entitled "Waiver Form." The form stated, in its entirety: "I *do not* wish to proceed with my petition for writ of habeas corpus review in this matter. I wish the sentence and the judgement [sic] of execution in *People v. William Kirkpatrick, Jr.* 1459044 to be carried out at this time." The document was signed and dated by Kirkpatrick.

The California Supreme Court then confronted the question whether this document constituted a valid waiver of Kirkpatrick's petition. The Court appointed a referee, Marin County Superior Court Judge Stephen Graham, to examine whether the waiver satisfied the Constitution's requirements – that is, whether Kirkpatrick was competent to waive the petition and whether the waiver was knowing, voluntary, and intelligent.

The referee did not recommend that the court find the waiver valid. He told the court that he was unable to conclude that the waiver was "knowing" or "intelligent" because Kirkpatrick "refused to engage in sufficient discussion with the Referee to permit the Referee to determine whether the request to withdraw the pending habeas corpus petition is made knowingly and intelligently." The report continued, "The Referee . . . is not able to assess, with the limitations imposed by Mr. Kirkpatrick, whether the act is done in the context of sufficient information and understanding of present circumstances and potential consequences to be found to be knowing and intelligent."

The referee's investigation was fatally impeded by Kirkpatrick's refusal to participate. Initially, Kirkpatrick cooperated with the referee. He appeared for status conferences on four occasions, and was evaluated by a court-appointed psychiatrist for two and a half hours. Following that examination, however, Kirkpatrick refused to participate further. He refused to be interviewed by three different experts retained by the Federal Public Defender. He also refused to attend the referee's evidentiary hearing in March

2001.[4] At no point in the investigation was he interviewed under oath or on the record about his understanding of the waiver's significance. As a result, the referee concluded that there was no evidentiary basis on which to determine that Kirkpatrick's waiver was valid.

Notwithstanding the referee's report, the California Supreme Court approved the waiver. It reversed the referee's recommendation without taking any further evidence, without giving any reasons for its decision, and without interviewing Kirkpatrick under oath or otherwise about his intentions or understanding of the waiver's legal effect. In a two sentence order, it simply stated that Kirkpatrick "made a knowing, intelligent, and voluntary waiver of his right to proceed." Having found the waiver valid, the court dismissed Kirkpatrick's petition, which if resolved on the merits would have served to exhaust his claims.

## D.

The case returned to federal court. Following the California Supreme Court's dismissal of the petition, Kirkpatrick's lawyers filed an amended federal habeas petition. This petition included the claims presented in his state court petition – that is, the claims that the state court decided that Kirkpatrick had waived.

---

[4] At that hearing, the court-appointed psychiatrist testified that Kirkpatrick had no "mental disease, disorder or defect." Although the experts supplied by the Federal Public Defender never had the opportunity to meet with Kirkpatrick themselves, they reviewed the report prepared by the psychiatrist and "expressed doubt as to the value of [her] opinions" because they disputed her methodology and believed that she "fail[ed] to address issues . . . raised by her report."

The State then moved in district court to dismiss the purportedly waived claims. Kirkpatrick objected, arguing that the California Supreme Court was wrong to find that his waiver was valid; he asserted that the waiver was not actually voluntary, knowing, and intelligent. The district court, however, upheld the state court's conclusion that the waiver was valid and dismissed the claims that had been the subject of the waiver.

These more than twenty-odd claims have not been adjudicated on the merits by any court. The claims challenge numerous aspects of Kirkpatrick's conviction and sentence. They include: the claim that law enforcement officials failed to investigate or provide exculpatory evidence; the claim that law enforcement officials conducted unconstitutional interrogations of Kirkpatrick; the claim that the decision to pursue the death penalty was based on Kirkpatrick's race; the claim that the trial court failed to provide Kirkpatrick with alternate counsel; the claim that the trial court was biased against Kirkpatrick; the claim that Kirkpatrick was improperly excluded from courtroom proceedings; the claim that Kirkpatrick was actually innocent; the claim that the prosecution improperly joined separate allegations in a single trial; the claim that Kirkpatrick was not competent to stand trial; the claim of numerous instances of prosecutorial misconduct prior to and during the guilt phase; the claim that the statute under which Kirkpatrick was charged is unconstitutional; the claim that the guilt phase jury instructions were unconstitutional; the claim of cumulative error prior to and during the guilt phase; the claim that the trial court erroneously allowed the jury to consider lack of remorse as an aggravating factor; the claim that trial counsel provided ineffective assistance of counsel by failing to present mitigating evidence at the penalty phase; the claim

that other mistakes at the penalty phase rendered counsels' assistance ineffective; the claim that trial counsel abandoned Kirkpatrick; the claim of numerous instances of prosecutorial misconduct during the penalty phase; the claim of ineffective assistance of appellate counsel; the claim of Due Process and Equal Protection violations in the appellate process; the claim that the death penalty as applied to Kirkpatrick is unconstitutional; and the claim that the cumulative impact of these numerous errors renders Kirkpatrick's conviction and sentence unconstitutional.

In dismissing these claims, the district court applied deference under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, to the California Supreme Court's determination that Kirkpatrick's waiver had been knowing, voluntary, and intelligent. It stated that "[u]nder AEDPA, the decision of the California Supreme Court must be given deference, and cannot . . . be reviewed de novo by this court." Applying the highly deferential standard, the district court concluded that because "there is [some] evidence to support the conclusory findings of the California Supreme Court," its conclusion must be upheld. "There has been no unreasonable determination of the facts or a decision contrary to, or involving an unreasonable application of, clearly established federal law," it said. The district court also held, in the alternative, that the California Supreme Court's decision that the waiver was valid was actually correct.

Kirkpatrick filed a revised amended petition, which omitted the claims that the district court deemed unexhausted, but reasserted other claims that had been resolved by the state court on direct appeal. The district court dismissed those claims as well, on the ground that none entitled Kirkpatrick

to relief under AEDPA. The district court granted a Certificate of Appealability as to one claim only – a reasserted claim that related solely to a penalty issue – and Kirkpatrick timely appealed.

## II. DISCUSSION

We consider here only the question whether the district court was wrong to dismiss as unexhausted the twenty-plus claims that the state court dismissed because of Kirkpatrick's purported waiver. Kirkpatrick maintains that the district court erred in upholding the waiver of those claims because the waiver was not valid. He asks that we review – and vacate – the district court's order dismissing the claims, and requests that they be remanded to that court for adjudication on the merits.

The waiver issue was not mentioned in the Certificate of Appealability granted by the district court. It was, however, properly raised by Kirkpatrick in his briefs on appeal. At our invitation, the State responded to Kirkpatrick's briefing of the issue, and Kirkpatrick replied to the State's response. Thus, the issue is fully briefed before us. We now expand the Certificate of Appealability and proceed to consider whether the district court erred in dismissing Kirkpatrick's purportedly unexhausted claims.[5]  *Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000).

---

[5] Because we expand the Certificate of Appealability to include the dismissal of the claims that the district court deemed unexhausted, and resolve that issue in the manner described below, we do not reach the originally certified issue regarding a penalty question.

We review de novo a district court's denial of a habeas petition, or any part of it, as unexhausted. *Rhoades v. Henry*, 638 F.3d 1027, 1034 (9th Cir. 2011). Similarly, we review de novo mixed questions of law and fact, such as whether Kirkpatrick's waiver of the claims was knowing, voluntary, and intelligent and therefore constitutionally valid. *Moran v. Godinez*, 57 F.3d 690, 698 (9th Cir. 1994) ("Whether a waiver of constitutional rights was made knowingly and voluntarily is a mixed question of law and fact which we review de novo."); *Campbell v. Wood*, 18 F.3d 662, 672 (9th Cir. 1994) (en banc).

## A.

A defendant's waiver of "his right to proceed" must be "knowing, voluntary, and intelligent." *Whitmore v. Arkansas*, 495 U.S. 149, 165 (1990). A court must inquire into whether a waiver meets these conditions in order "to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993).

There are "two distinct dimensions" to the knowing, voluntary, and intelligent requirement. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.*; *see also Comer v. Schriro*, 480 F.3d 960, 965 (9th Cir. 2007) (en banc) (per curiam) ("A waiver of constitutional rights is voluntary if, under the totality of the circumstances, it was the product of a free and deliberate choice rather than coercion or improper inducement."). "Second, the waiver must have been made

with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421.

In its briefs, the State agreed that Kirkpatrick's waiver is valid only if it was knowing, voluntary, and intelligent. At oral argument, however, the State took "inconsistent positions" on whether the waiver needed to satisfy these requirements, and eventually, in a post-argument letter, firmly changed its position and stated that it did not. Assuming that the state did not waive its right to make this tardy and inconsistent argument, its solitary citation to *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), does not compel or even support its newfound position. *Schneckloth* observed that the knowing, voluntary, and intelligent requirement does not necessarily apply "in every situation where a person has failed to invoke a constitutional protection" and is most often applied in the context of constitutional trial rights. *Id.* at 235–37. The Supreme Court has made clear, however, and we have long recognized, that the requirement *does* apply to a habeas petitioner's waiver of his right to proceed further with his case or claim. *See Demosthenes v. Baal*, 495 U.S. 731, 732–36 (1990) (applying the knowing, voluntary, and intelligent requirement to a habeas petitioner who had "filed a petition for state postconviction relief, but, prior to the hearing, changed his mind and withdrew the petition"); *Dennis ex rel. Butko v. Budge*, 378 F.3d 880, 882–83 (9th Cir. 2004) (applying the knowing, voluntary, and intelligent requirement to a habeas petitioner who wrote a letter to the Nevada Supreme Court stating, "I no longer wish to pursue any appeals and want my sentence to be carried out"); *Comer v. Stewart*, 215 F.3d 910, 912, 917 (9th Cir. 2000) (applying the knowing, voluntary,

and intelligent requirement to a habeas petitioner who allegedly "[did] not wish to pursue further legal remedies").

Accordingly, Kirkpatrick's waiver "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421. In short, the waiver is constitutionally valid only if it was knowing, voluntary, and intelligent. *Whitmore*, 495 U.S. at 165.

In deciding whether a waiver meets this constitutional requirement, "courts indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404 (1977). "[T]he proper standard to be applied in determining the question of waiver as a matter of federal constitutional law" is that it is "incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.'" *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), and noting that this "standard has been reiterated in many cases"). In other words, "the burden of proving the validity of a waiver of constitutional rights is always on the *government*." *Burbine*, 475 U.S. at 450.

**B.**

The California Supreme Court understood that the knowing, voluntary, and intelligent standard applied. Contrary to the recommendation of its referee, however, it decided that Kirkpatrick's waiver met those requirements and was therefore constitutionally valid. The district court believed that it was required to defer to this conclusion under AEDPA. We turn now to the question of what level of deference, if any, the district court must apply to the state court's determination under that statute.

When a district court reviews a state court's decision in a habeas case, it ordinarily defers to its conclusions and asks only whether the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The district court reviewed the California Supreme Court's approval of Kirkpatrick's waiver under this deferential regime. It stated that because "there is [some] evidence to support the conclusory findings of the California Supreme Court," its conclusion must be upheld. It further stated, "There has been no unreasonable determination of the facts or a decision contrary to, or involving an unreasonable application of, clearly established federal law." "Under AEDPA," the district court explained, "the decision of the California Supreme Court must be given deference, and cannot . . . be reviewed de novo by this court." It declared that its "power to review the decision of the California Supreme Court is extremely limited" (by AEDPA) and that its approach must be "highly deferential."

This is where the district court went wrong. Contrary to its belief, Section 2254(d) of AEDPA applies only to the review of *claims* that have been adjudicated on the *merits*. The section reads: "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to *any claim that was adjudicated on the merits* in State court proceedings unless" the deferential requirements of AEDPA are satisfied. 28 U.S.C. § 2254(d) (emphasis added). The Supreme Court

has defined the word "claim" in the AEDPA statute as "an asserted federal basis for relief from a state court's judgment of conviction." *Gonzalez v. Crosby*, 545 U.S. 524, 530 (2005). *See also Cristin v. Brennan*, 281 F.3d 404, 418 (3d Cir. 2002) ("By stating that an 'application for a writ of habeas corpus' can be granted 'with respect to any claim,' the sentence clearly implies that Congress used the term 'claim' as a substantive request for the writ of habeas corpus."). By its terms, therefore, AEDPA only provides for deferential review of a state court's adjudication on the merits of a claim for relief – that is, a claim that could provide a "basis for relief from a state court's judgment of conviction." *Crosby*, 545 U.S. at 530. With respect to such "claims," a federal court may grant the application only if the deferential requirements of AEDPA are satisfied. A federal court's determination is not subject to the deferential framework of AEDPA, however, when it simply reviews a state court's disposition of a question that does not constitute a claim for relief, does not decide the merits of such a claim, and does not provide a "basis for relief from a state court's judgment of conviction" (or imposition of a sentence). *Id.* A decision regarding the validity of a waiver of a defendant's right to pursue a claim is by no stretch of the legal imagination a decision on the merits of the claim itself.

Kirkpatrick's assertion that his waiver was not knowing, voluntary, and intelligent is simply not an affirmative "claim" for relief. Although Kirkpatrick does contend that the state court made a legal error, he does not, on the basis of that error, claim entitlement to the writ of habeas corpus. If we agree with Kirkpatrick, our agreement would not provide him with "relief from the state court's judgment of conviction" or with a vacatur of his sentence. It would simply enable him to pursue the claims that the district court ignored – claims that

might themselves provide the "basis for relief" if *they* were decided in Kirkpatrick's favor "on the merits" (or the basis for no relief whatsoever if they failed "on the merits"). As a result, the district court was wrong to apply AEDPA deference to the state court's determination of the constitutional validity of Kirkpatrick's waiver. It should, instead, have reviewed the state court's decision as to the validity of the waiver by determining de novo whether the state had carried its burden of proving that the waiver was knowing, voluntary, and intelligent.[6]

The Third Circuit has reached the same conclusion. A district court, it held, "need not defer under § 2254(d) to the state court's determination that [petitioner's] waiver was valid." *Fahy v. Horn*, 516 F.3d 169, 180 (3d Cir. 2008). The court reasoned that "a 'claim' is that which, if granted, provides entitlement to relief on the merits. Because

---

[6] The dissent contends that the finding of "a knowing, intelligent, and voluntary waiver" constitutes a finding of fact to which we must accord deference under 28 U.S.C. 2254(e)(1). However, in *United States v. Cazares*, we explained:

> A waiver is an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The finding of a knowing and voluntary waiver is a mixed question of law and fact which we review de novo. *Terrovona v. Kincheloe*, 852 F.2d 424, 427 (9th Cir.1988). The ultimate issue of voluntariness is a legal question requiring independent federal determination. *Arizona v. Fulminante*, 499 U.S. 279, 286, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

788 F.3d 956 (9th Cir. 2015) (quoting *Campbell*, 18.F3d at 672); *see Lambert v. Blodgett*, 393 F.3d 943, 976 (9th Cir. 2004) (Section "2254(e)(1) is restricted to pure questions of historical fact.").

resolution of the question as to whether [petitioner's] waiver was valid will not entitle him to relief on the merits of his habeas petition, the waiver question is not a 'claim.' Therefore, the state court's determination that the waiver was valid is not entitled to deference under § 2254(d)." *Id.* (citation omitted). We agree with our fellow circuit without the slightest reservation.

## C.

When a district court applies the wrong legal standard, as it did below, we ordinarily remand the case so that it may apply the correct one in the first instance. Here, however, we find it unnecessary to do so because the parties agree that the district court held in the alternative that, putting AEDPA deference aside, Kirkpatrick's waiver was actually valid. The district court stated that it "conducted its own review of the proceedings underpinning the referee's report and the decision of the California Supreme Court to be certain that there has been no improper result," and concluded that it "agrees with the findings of the California Supreme Court." We review the district court's alternate holding de novo, because the validity of the waiver is, as we have noted above, a mixed question of fact and law. *Godinez*, 57 F.3d at 698.

We hold that the district court's conclusion that Kirkpatrick's waiver was valid lacks a sufficient basis in the record and accordingly remand for an adjudication of the merits of the claims at issue.

## 1.

The record does not supply an adequate basis upon which to conclude that the waiver was knowing, voluntary, and

intelligent because it contains good reason to believe that Kirkpatrick did not understand the legal implications of the waiver. Kirkpatrick's handwritten filing stated: "I do not wish to proceed with my petition for writ of habeas corpus review in this matter. I wish the sentence and the judgement [sic] of execution . . . to be carried out at this time." There is substantial evidence in the record that he believed that the waiver would not result in his abandonment of his claims altogether but would, instead, permit him to take over his case personally and pursue those claims pro se. More specifically, there is clear evidence that he did not wish to have the State proceed with his execution forthwith but rather that he intended to litigate his case further on the merits. This evidence undermines any finding that the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421.

As an example, there are Kirkpatrick's statements to the referee. Before Kirkpatrick refused to engage further with him, the two men met for an initial conference at which the referee explained that he was brought in to assess whether Kirkpatrick's waiver had been made knowingly, voluntarily, and intelligently. The referee explained the purpose and legal effect of his inquiry as follows: "they [*i.e.*, the court] want to be sure that before they allow you to effectually relieve your attorney, who is currently appointed and in place, they want to be sure that you are competent and that you understand what's going on." Kirkpatrick replied, "I believe it is the Court's intent to give me full control of my case. . . . I think if they're fair and honest, they will agree with me that I am entitled to my day in court. . . . I believe it is their intention to give me that control of the case." The referee seemed to agree: "If we end up concluding and they're satisfied with the

factual conclusion that you are competent and that you understand what's going on and that you are making a knowing and voluntary waiver, then I suspect that they probably will give you your wish and relieve counsel and let you go on your way." This exchange appears clearly to reveal a desire by Kirkpatrick to proceed further with his claims, not to withdraw them, and certainly not to have his death sentence "carried out at this time."

Kirkpatrick's statements to the psychiatrist, who examined him for two and a half hours at the referee's request, support the same conclusion. In her post-examination report, the psychiatrist stated that Kirkpatrick's "ultimate goal" is "a re-trial." "[H]e makes it plain that he wants to run his own case, to be in charge of his own defense, to represent himself." Later in the report, the referee reiterated the same conclusion: "He wants to represent himself, plans to 'hire Black lawyers,' who will go to the media and get a re-trial on the original conviction."

As for the waiver form itself, the psychiatrist concluded that Kirkpatrick did not understand that the waiver would relinquish his claims. She wrote, "He gives one the clear impression that his wish to withdraw the Petition does not indicate that he wants to speed the process toward execution. In his 7/23/00 request [*i.e.*, the waiver form], he wrote 'I wish the sentence and judgment of execution . . . to be carried out at this time.' But he tells me that he has no intention of discontinuing litigation."

These statements to the referee and to the psychiatrist are entirely inconsistent with the state court's conclusion that the waiver form demonstrated Kirkpatrick's knowing and intelligent decision to abandon the claims entirely. To the

contrary, they show that Kirkpatrick did not fully understand "the consequences of the decision to abandon" his right to proceed – in direct contravention of the Constitution's requirements. *Burbine*, 475 U.S. at 421. His own conduct further supports this conclusion. Kirkpatrick told the court, "my intention is to stay alive as long as possible, Judge," thus communicating a desire that was the precise opposite of what his waiver would have accomplished. Of equal importance, Kirkpatrick gave no indication at any point in the proceedings that he was aware of the contents of his exhaustion petition. On the basis of the record, therefore, it is clear that the State failed to carry its burden of demonstrating that Kirkpatrick's waiver was knowing, voluntary, and intelligent.

**2.**

There is another deficiency in the record that also precludes a finding that Kirkpatrick's waiver was valid. Where courts have previously found waivers of habeas claims to be knowing, voluntary, and intelligent, and therefore valid, they have done so after a hearing at which the court conducts a colloquy to assess the petitioner's intentions and whether he understands the consequences of the waiver. *See, e.g.*, *Demosthenes*, 495 U.S. at 732–33 (concluding that a state court waiver was valid only after that court questioned the petitioner under oath and concluded specifically that the waiver was intelligently executed); *Dennis*, 378 F.3d at 884 (accepting a state court waiver as valid because that court "engaged in a comprehensive colloquy" with the petitioner during which "[t]he court had [petitioner] re-read his initial habeas petition . . . and the court reviewed with [petitioner] the assignments of error alleged in the petition" and the petitioner in court "asserted his desire to give up his right to pursue each of these claims"); *Fahy*, 516 F.3d at 183–85

(holding that even though the state court did engage in a colloquy with the petitioner, that colloquy was insufficient to establish that the waiver was knowing and voluntary because the state court had refused to permit petitioner's counsel to ask him questions that would probe the waiver's validity); s*ee also St. Pierre v. Cowan*, 217 F.3d 939, 947 (7th Cir. 2000) (finding that a waiver was not valid because no court ever had a chance to question the petitioner on the record as to his intentions and understanding).

Here, the state court never questioned Kirkpatrick on the record as to whether he understood the consequences of the waiver or the nature of the claims he was waiving. As a result, the court had no opportunity to assess Kirkpatrick's state of mind or to assure itself that the handwritten "Waiver Form" reflected his knowing, voluntary, and intelligent choice. All that the court could possibly have relied on in finding the waiver valid was the form itself and the record of the referee's investigation – which concluded that there was *not* enough evidence to find the waiver valid.

Under the circumstances, it is clear that an independent review of the record necessarily reveals that the state wholly failed to carry its burden of showing that Kirkpatrick's waiver was knowing, voluntary, and intelligent. We therefore hold that the district court erred in concluding that the purported waiver was valid, whether as a result of applying AEDPA deference to the state court's determination or as a result of its independent review of the record before the state court.

We recognize that it was the petitioner who rendered difficult or impossible the judicial examination that might have enabled the court to determine the validity of his waiver. This is not, however, a case in which a petitioner is being

rewarded for obstructionism at the State's expense. If Kirkpatrick's intention truly were to abandon his claims, his failure to participate in the orderly judicial process designed to determine that intent would serve only to frustrate his own effort; it is he who would suffer most from his noncooperation. If his intention were not to abandon those claims but rather to continue to pursue them, a conclusion that the waiver form was not valid would serve principally to enable the court to arrive at the right result under the Constitution. Either way, the State suffers little if any injury from proceeding to a determination of the merits of Kirkpatrick's claims rather than relying on a dubious waiver of critical constitutional rights that is unsupported by the record. In any event, Kirkpatrick's refusal to cooperate with the referee's investigation provides another reason to believe that his intent was not to waive his claims and that his purported waiver was not fully knowing and intelligent as the Constitution requires.

## D.

In view of the above, we vacate the district court's order dismissing the claims that Kirkpatrick purportedly waived, and remand those claims to the district court for adjudication on the merits. That court shall consider the claims de novo on remand. Because the claims were erroneously dismissed as waived by the California Supreme Court, they were never adjudicated on the merits in state court. Thus, they must be considered de novo because there is no state court judgment to which the federal court might properly defer. *Harrington v. Richter*, 562 U.S. 86, 92 (2011); *Cone v. Bell*, 556 U.S. 449, 472 (2009).

## III. CONCLUSION

The district court's order dismissing the claims in Kirkpatrick's petition for lack of exhaustion is **VACATED**, and the case is **REMANDED** to the district court so that it may adjudicate those claims on the merits.

KOZINSKI, Circuit Judge, dissenting:

My colleagues err repeatedly but it doesn't much matter.

### I

The majority's first blunder is failing to defer to the California Supreme Court, which found unanimously that Kirkpatrick made a "rational choice with respect to withdrawing" his habeas petition and "a knowing, intelligent, and voluntary waiver of his right to proceed." The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires deference to that finding. Under 18 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court" in a state habeas proceeding "shall be presumed to be correct." This is true "whether the court be a trial court or an appellate court." *Sumner* v. *Mata*, 449 U.S. 539, 547 (1981).

The majority quotes selectively from *Lambert* v. *Blodgett* that "2254(e)(1) is restricted to pure questions of historical fact." 393 F.3d 943, 976 (9th Cir. 2004). But we also said that "an issue that involves inquiry into a state of mind may be considered a question of fact." *Id.* "Knowing, intelligent

and voluntary" are all states of mind.  So *Blodgett* requires us to defer.

Plenty of evidence supports the state court's finding. After receiving Kirkpatrick's waiver letter, the California Supreme Court appointed Judge Stephen Graham to assess its validity.   He, in turn, appointed Dr. Diane McEwen—a forensic psychiatrist of thirty years experience—to interview Kirkpatrick.  Dr. McEwen found that Kirkpatrick "indeed made his decision to withdraw the petition in a conscious, goal-directed manner, free of any intervening mental illness." Kirkpatrick appeared "intelligent, self-determined, oriented, consistent, deliberate and unwavering in his positions." Consistent with his medical records, Kirkpatrick showed "no evidence of mental impairment."

Judge Graham questioned Kirkpatrick about what he intended to accomplish with his waiver.   Kirkpatrick answered:  "Competency and vacating of the appeal."  Judge Graham advised Kirkpatrick that his appeal contained "some possibility of ultimately preventing [his] execution."   The government attorney then further explained to Kirkpatrick that waiving his state appeal could limit his federal claims. Kirkpatrick said:  "I can appreciate that."

Judge Graham reported that Kirkpatrick wasn't "suffering from any mental disease, disorder or defect which may substantially affect his capacity to appreciate his position and to make a rational choice with respect to continuing or abandoning further litigation."  The California Supreme Court acknowledged Judge Graham's report, adopted his findings as to mental capacity and voluntariness, and further found that Kirkpatrick acted knowingly and intelligently.   It therefore granted his request to withdraw the petition.  My

colleagues don't agree with the California Supreme Court's findings but there's more than enough evidence to support them.

## II

Were I to review de novo, Kirkpatrick would fare no better. To me, Kirkpatrick seems crazy like a fox. As he told Judge Graham with a smile, his "intention is to stay alive as long as possible." The majority cites this as proof that Kirkpatrick didn't grasp the consequences of waiving his appeals. More likely, Kirkpatrick well understood that withdrawing his petition would trigger this protracted litigation. This was a savvy move: It's been seventeen years since Kirkpatrick sent his letter to the California Supreme Court. Now he'll spend many more years litigating his merits claims. According to Dr. McEwen, Kirkpatrick is "living with what he's got" and "trying to drive everybody else crazy." This man is playing us.

## III

The majority also invents a colloquy requirement and faults the state courts for failing to comply. Maj. Op. 24–26. But courts have "discretion in affording a hearing that is suitable in the circumstances." *Dennis ex rel. Butko* v. *Budge*, 378 F.3d 880, 894 (9th Cir. 2004). Courts need this flexibility to deal with troublemakers like Kirkpatrick who refuse to attend hearings. Furthermore, we're bound by the Supreme Court case law as it stood at the time of the state court's decision in 2001. *Lockyer* v. *Andrade*, 538 U.S. 63, 71–72 (2003). No such case requires a colloquy.

The majority points to cases where a colloquy was held *sufficient*, but none says a colloquy is *necessary*. *Demosthenes* v. *Baal*[1] noted that the state court found a valid waiver after defendant was questioned in open court, but doesn't say there must be a colloquy. 495 U.S. 731, 735 (1990). Nor does *Dennis*, where we accepted a waiver that followed a "comprehensive colloquy" with the petitioner, but never hinted that the waiver would be invalid without the colloquy. 378 F.3d at 884. *Dennis* is, in any event, irrelevant because it's not a Supreme Court case. *See Lockyer*, 538 U.S. at 71–72.

## IV

But none of this matters because California doesn't have a death penalty. Sure, there's a death row in California—the biggest in the Western Hemisphere. Evelyn Nieves, *Rash of Violence Disrupts San Quentin's Death Row*, N.Y. Times (May 22, 2001), http://www.nytimes.com/2001/05/22/us/rash-of-violence-disrupts-san-quentin-s-death-row.html. At last count, it housed 747 inmates. Cal. Dep't of Corr. & Rehab., Death Row Tracking System Condemned Inmate List at 29 (June 2017), *available at* http://www.cdcr.ca.gov/capital_punishment/docs/condemnedinmatelistsecure.pdf. But there have been only thirteen executions since 1976, the most recent over ten years ago. Arthur L. Alarcón & Paula M. Mitchell, *Executing the Will of the Voters?: A Roadmap to Mend or End the California Legislature's Multi-Billion-Dollar Death Penalty Debate*, 44 Loy. L.A. L. Rev. 41, 51 (2011). Death row inmates in California are far more likely

---

[1] I remember that case well. *See* Alex Kozinski, *Tinkering with Death*, New Yorker, Feb. 10, 1997, at 48.

to die from natural causes or suicide than execution.  *Id.* at 53.

There are plausible reasons to oppose the death penalty. Some think it barbaric.  It's also exceptionally expensive: California taxpayers have lavished approximately $5 billion on their capital punishment system.  Jazmine Ulloa, *Will ending the death penalty save California more money than speeding up executions?*, L.A. Times, Nov. 1, 2016, http://www.latimes.com/politics/la-pol-ca-death-penalty-costs-snap-20161101-story.html.  Then, there's the risk that we might be putting innocent people to death. *See Glossip* v. *Gross*, 135 S. Ct. 2726, 2756–59 (2015) (Breyer, J., dissenting).  Or that race may be a factor in how the death penalty is imposed.[2]  And there's the impulse to follow other Western democracies that have abandoned this hoary punishment. *See* Carol S. Steiker & Jordan M. Steiker, *Courting Death* 22 (2016).  But it's "settled that capital punishment is constitutional." *Glossip*, 135 S. Ct. at 2732. So the people of California are entitled to have a death penalty if they choose.  Vox populi, vox dei.

---

[2] *See, e.g.*, GAO, Report to the Senate and House Committees on the Judiciary: Death Penalty Sentencing 5–6 (1990) (synthesizing studies from 1972 to 1990 and finding that victim race influences death sentencing rate but defendant's race may not); Glenn L. Pierce & Michael L. Radelet, *Impact of Legally Inappropriate Factors on Death Sentencing for California Homicides, 1990–1999, The Empirical Analysis*, 46 Santa Clara L. Rev. 1, 19 (2005) ("[H]omicides [in California] involving non-Hispanic white victims are 3.7 times as likely to result in a death sentence than those with non-Hispanic African American victims."). *But see* Richard Berk et al., *Statistical Difficulties in Determining the Role of Race in Capital Cases: A Re-analysis of Data from the State of Maryland*, 21 J. Quantitative Criminology 365, 386 (2005) (finding that race appears to have little or no impact on capital sentencing rates).

The people have made their views plain by voting for the death penalty ten times in the last forty-five years. In 1972, the California Supreme Court held that the state constitution didn't permit capital punishment. *People* v. *Anderson*, 493 P.2d 880, 883 (Cal. 1972). Voters swiftly amended the constitution to say it does. Prop. 17 (Cal. 1972). After the United States Supreme Court held that the death penalty is constitutional in *Gregg* v. *Georgia*, 428 U.S. 153, 186–87 (1976), California voters greatly expanded the list of death-eligible crimes. Prop. 7 (Cal. 1978). Ballot measures in 1990, 1996 and 2000 further added to this list. Prop. 114 (Cal. 1990); Prop. 115 (Cal. 1990); Prop. 195 (Cal. 1996); Prop. 196 (Cal. 1996); Prop. 18 (Cal. 2000). In 2012, voters were asked to repeal the death penalty. Prop. 34 (Cal. 2012). They said no. And last year they rebuffed another repeal effort and, instead, approved a counter-proposition designed to speed up the appeals process and presumably bring about swifter executions.[3]

Nonetheless, California has no functional death penalty. How this came about is no mystery. As part of a nationwide campaign to have lethal injection declared unconstitutional, California death row inmates challenged the state's execution protocol in 2006. A district court eventually held that California's execution method was "broken." *Morales* v. *Tilton*, 465 F.Supp.2d 972, 974 (N.D. Cal. 2006). That ruling likely was wrong in light of subsequent Supreme Court cases. In *Baze* v. *Rees*, the Court held that Kentucky's lethal

---

[3] Whether this purpose will be achieved remains to be seen. The California Supreme Court recently considered the constitutionality of this proposition. It upheld most of it but declared its five-year time limit on capital appeals aspirational. *Briggs* v. *Brown*, 400 P.3d 29, 57 (Cal. 2017).

injection protocol, which mirrored California's, was constitutional. 553 U.S. 35, 49–56 (2008); *see also Glossip*, 135 S.Ct. at 2737–38. Regardless, the state did not appeal. Instead, state officials set about revamping California's execution protocol. They have been busy with that task since 2006. Other states have managed to amend their protocols and the Supreme Court has consistently brushed aside challenges to execution drug cocktails. *See Glossip*, 135 S.Ct. 2726. But California officials haven't managed to come up with a workable protocol.

Meanwhile, the people of California labor under the delusion that they live in a death penalty state. They may want capital punishment to save innocent lives by deterring murders.[4] But executions must actually be carried out if they're to have any deterrent effect.[5] Maybe death penalty

---

[4] *See, e.g.*, Hashem Dezhbakhsh, et al., *Does Capital Punishment Have a Deterrent Effect? New Evidence from Post-moratorium Panel Data*, 5 Am. L. & Econ. Rev. 344 (2003) (estimating that each execution results in eight to eighteen fewer murders); Cass R. Sunstein & Adrian Vermeule, *Is Capital Punishment Morally Required? Acts, Omissions, and Life-Life Tradeoffs*, 58 Stan. L. Rev. 703, 713 (2005) ("the recent evidence of a deterrent effect from capital punishment seems impressive"). *But see* John J. Donohue & Justin Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791, 794 (2005) (the death penalty "is applied so rarely that the number of homicides it can plausibly have caused or deterred cannot be reliably disentangled from the large year-to-year changes in the homicide rate").

[5] Joanna M. Sheperd, *Murders of Passion, Execution Delays, and the Deterrence of Capital Punishment*, 33 J. Legal Stud. 283, 313 (2004) (executions appear to have a larger deterrent effect than do death sentences); Kenneth C. Land, et al., *The Short-term Effects of Executions on Homicides: Deterrence, Displacement, or Both?*, 47 Criminology

supporters believe in just retribution; that goal, too, is frustrated if there's no active execution chamber. Or perhaps the point is closure for victims' families, but these are surely false hopes. Kirkpatrick murdered Rose Falconio's sixteen-year-old son more than thirty years ago, and her finality is nowhere near. If the death penalty is to serve whatever purpose its proponents envision, it must actually be carried out. A phantom death penalty is a cruel and expensive hoax.

Which is why it doesn't matter what we hold today. One way or the other, Kirkpatrick will go on to live a long life "driv[ing] everybody else crazy," while copious tax dollars are spent litigating his claims. And my colleagues and I will continue to waste countless hours disputing obscure points of law that have no relevance to the heinous crimes for which Kirkpatrick and his 746 housemates continue to evade their lawful punishment. It's as if we're all performers in a Gilbert and Sullivan operetta. We make exaggerated gestures and generate much fanfare. But in the end it amounts to nothing.

---

1009, 1038 (Oct. 2009) (concluding that "evidence exists of modest, short-term reductions in the numbers of homicides in Texas in the months of or after executions").