KOZINSKI, Circuit Judge, dissenting: My colleagues err repeatedly but it doesn’t much matter. I The majority’s first blunder is failing to defer to the California Supreme Court, which found unanimously that Kirkpatrick made a “rational choice with respect to withdrawing” his habeas petition and “a knowing, intelligent, and voluntary waiver of his right to proceed.” The Antiterrorism and Effective Death Penalty Act (“AED-PA”) requires deference to that finding. Under 18 U.S.C. § 2254(e)(1), “a determination of a factual issue made by a State court” in a state habeas proceeding “shall be presumed to be correct.” This is true “whether the court be a trial court or an appellate court.” Sumner v. Mata, 449 U.S. 539, 547, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). The majority quotes selectively from Lambert v. Blodgett that “2254(e)(1) is restricted to pure questions of historical fact.” 393 F.3d 943, 976 (9th Cir. 2004). But we also said that “an issue that involves inquiry into a state of mind may be considered a question of fact.” Id. “Knowing, intelligent and voluntary” are all states of mind. So Blodgett requires us to defer. Plenty of evidence supports the state court’s finding. After receiving Kirkpatrick’s waiver letter, the California Supreme Court appointed Judge Stephen Graham to assess its validity. He, in turn, appointed Dr. Diane McEwen—a forensic psychiatrist of thirty years experience—to interview Kirkpatrick. Dr. McEwen found that Kirkpatrick “indeed made his decision to withdraw the petition in a conscious, goal-directed manner, free of any intervening mental illness.” Kirkpatrick appeared “intelligent, self-determined, oriented, consistent, deliberate and unwavering in his positions.” Consistent with his medical records, Kirkpatrick showed “no evidence of mental impairment.” Judge Graham questioned Kirkpatrick about what he intended to accomplish with his waiver. Kirkpatrick answered: “Competency and vacating of the appeal.” Judge Graham advised Kirkpatrick that his appeal contained “some possibility of ultimately preventing [his] execution.” The government attorney then further explained to Kirkpatrick that waiving his state appeal, could limit his federal claims. Kirkpatrick said: “I can appreciate that.” Judge Graham reported that Kirkpatrick wasn’t “suffering from any mental 'disease, disorder or defect which may substantially affect his capacity to appreciate his position and to make a rational choice with respect to continuing or abandoning further litigation.” The California Supreme Court acknowledged Judge Graham’s report, adopted his findings as to mental capacity and voluntariness, and further found that Kirkpatrick acted knowingly and intelligently. It therefore granted his request to withdraw the petition. My colleagues don’t agree with the California Supreme Court’s findings but there’s more than enough evidence to support them. II Were I to review de novo, Kirkpatrick would fare no better. To me, Kirkpatrick seems crazy like a fo¿ As he told Judge Graham with a smile, his “intention is to stay alive as long as possible.” The majority cites this as proof that Kirkpatrick didn’t grasp the consequences of waiving his appeals. More likely, Kirkpatrick well understood that withdrawing his petition would trigger this protracted litigation. This was a savvy move: It’s been seventeen years since Kirkpatrick sent his letter to the California Supreme Court. Now he’ll spend many more years litigating his merits claims. According to Dr. McEwen, Kirkpatrick is “living with what he’s got” and “trying to drive everybody else crazy.” This man is playing us. III The majority also invents a colloquy requirement and faults the state courts for failing to comply. Maj. Op. 1059-60. But courts have “discretion in affording a hearing that is suitable in the circumstances.” Dennis ex rel. Butko v. Budge, 378 F.3d 880, 894 (9th Cir. 2004). Courts need this flexibility to deal with troublemakers like Kirkpatrick who refuse to attend hearings. Furthermore, we’re bound by the Supreme Court case law as it stood at the time of the state court’s decision in 2001. Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). No such case requires a colloquy. The majority points to cases where a colloquy was held sufficient, but none says a colloquy is necessary. Demosthenes v. Baal[1] noted that the state court found a valid waiver after defendant was questioned in open court, but doesn’t say there must be a colloquy. 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990). Nor does Dennis, where we accepted a waiver that followed a “comprehensive colloquy” with the petitioner, but never hinted that the waiver would be invalid without the colloquy. 378 F.3d at 884. Dennis is, in any event, irrelevant because it’s not a Supreme Court case., See Lockyer, 538 U.S. at 71-72, 123 S.Ct. 1166. IV But none of this matters because California doesn’t have a death penalty. Sure, there’s a death row in California—the biggest in the Western Hemisphere. Evelyn Nieves, Rash of Violence Disrupts San Quentin’s Death Row, N.Y. Times (May 22, 2001), http://www.nytimes.com/2001/05/ 22/us/rash-of-violence-disrupts-san-quentin-s-death-row.html. At last count, it housed 747 inmates. Cal. Dep’t of Corr. & Rehab., Death Row Tracking System Condemned Inmate List at 29 (June 2017), available at http://www.cdcr.ca.gov/ capitaLpunishment/docs/condemned inmatelistseeure.pdf. But there have been only thirteen executions since 1976, the most recent over ten years ago. Arthur L. Alarcón & Paula M. Mitchell, Executing the Will of the Voters?: A Roadmap to Mend or End the California Legislature’s Multi-Billion-Dollar Death Penalty Debate, 44 Loy. L.A. L. Rev. 41, 51 (2011). Death row inmates in California are far more likely to die from natural causes or suicide than execution. Id. at 53. There are plausible reasons to oppose the death penalty. Some think it barbaric. It’s also exceptionally expensive: California taxpayers have lavished approximately $5 billion on their capital punishment system. Jazmine Ulloa, Will ending the death penalty save California more money than speeding up executions?, L.A. Times, Nov. 1, 2016, http://www.latimes.com/politics/la-pol-ca-death-penalty-costs-snap-20161101story.html. Then, there’s the risk that we might be putting innocent people to death. See Glossip v. Gross, — U.S. —, 135 S.Ct. 2726, 2756-59, 192 L.Ed.2d 761 (2015) (Breyer, J., dissenting). Or that race may be a factor in how the death penalty is imposed.[2] And there’s the impulse to follow other Western democracies that have abandoned this hoary punishment. See Carol S. Steiker & Jordan M. Steiker, Courting Death 22 (2016). But it’s “settled that capital punishment is constitutional.” Glossip, 135 S.Ct. at 2732. So the people of California are entitled to have a death penalty if they choose. Vox populi, vox dei. The people have made their views plain by voting for the death penalty ten times in the last forty-five years. In 1972, the California Supreme Court held that the state constitution didn’t permit capital punishment. People v. Anderson, 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880, 883 (1972). Voters swiftly amended the constitution to say it does. Prop. 17 (Cal. 1972). After the United States Supreme Court held that the death penalty is constitutional in Gregg v. Georgia, 428 U.S. 153, 186-87, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), California voters greatly expanded the list of death-eligible crimes. Prop. 7 (Cal. 1978). Ballot measures in 1990, 1996 and 2000 further added to this list. Prop. 114 (Cal. 1990); Prop. 115 (Cal. 1990); Prop. 195 (Cal. 1996); Prop. 196 (Cal. 1996); Prop. 18 (Cal. 2000). In 2012, voters were asked to repeal the death penalty. Prop. 34 (Cal. 2012). They said no. And last year they rebuffed another repeal effort and, instead, approved a counter-proposition designed to speed up the appeals process and presumably bring about swifter executions.[3] Nonetheless, California has no functional death penalty. How this came about is no mystery. As part of a nationwide campaign to have lethal injection declared unconstitutional, California death row inmates challenged the state’s execution protocol in 2006. A district court eventually held that California’s execution method was “broken.” Morales v. Tilton, 465 F.Supp.2d 972, 974 (N.D. Cal. 2006). That ruling likely was wrong in light of subsequent Supreme Court cases. In Baze v. Rees, the Court held that Kentucky’s lethal injection protocol, which mirrored California’s, was constitutional. 553 U.S. 35, 49-56, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008); see also Glossip, 135 S.Ct. at 2737-38. Regardless, the state did not appeal. Instead, state officials set about revamping California’s execution protocol. They have been busy with that task since 2006. Other states have managed to amend their protocols and the Supreme Court has consistently brushed aside challenges to execution drug cocktails. See Glossip, 135 S.Ct. 2726. But California officials haven’t managed to come up with a workable protocol. Meanwhile, the people of California labor under the delusion that they live in a death penalty state. They may want capital punishment to save innocent lives by deterring murders.[4] But executions must actually be carried out if they’re to have any deterrent effect.[5] Maybe death penalty supporters believe in just retribution; that goal, too, is frustrated if there’s no active execution chamber. Or perhaps the point is closure for victims’ families, but these are surely false hopes. Kirkpatrick murdered Rose Falconio’s sixteen-year-old son more than thirty years ago, and her finality is nowhere near. If the death penalty is to serve whatever purpose its proponents envision, it must actually be carried out. A phantom death penalty is a cruel and expensive hoax. Which is why it doesn’t matter what we hold today. One way or the other, Kirkpatrick will go on to live a long life “driving] everybody else crazy,” while copious tax dollars are spent litigating his claims. And my colleagues and I will continue to waste countless hours disputing obscure points of law that have no relevance to the heinous crimes for which Kirkpatrick and his 746 housemates continue to evade their lawful punishment. It’s as if we’re all performers in a Gilbert and Sullivan operetta. We make exaggerated gestures and generate much fanfare. But in the end it amounts to nothing. . I remember that case well. See Alex Kozinski, Tinkering with Death, New Yorker, Feb. 10, 1997, at 48. . See, e.g., GAO, Report to the Senate and House Committees on the Judiciary: Death Penalty Sentencing 5-6 (1990) (synthesizing studies from 1972 to 1990 and finding that victim race influences death sentencing rate but defendant's race may not); Glenn L. Pierce & Michael L. Radelet, Impact of Legally Inappropriate Factors on Death Sentencing for California Homicides, 1990-1999, The Empirical Analysis, 46 Santa Clara L. Rev. 1, 19 (2005) ("[H]omicides [in California] involving non-Hispanic white victims are 3.7 times as likely to result in a death sentence than those with non-Hispanic African American victims.”). But see Richard Berk et al., Statistical Difficulties in Determining the Role of Race in Capital Cases: A Re-analysis of Data from the State of Maryland, 21 J. Quantitative Criminology 365, 386 (2005) (finding that race appears to have little or no impact on capital sentencing rates). . Whether this purpose will be achieved remains to be seen. The California Supreme Court recently considered the constitutionality of this proposition. It upheld most of it but declared its five-year time limit on capital appeals aspirational. Briggs v. Brown, 3 Cal.5th 808, 221 Cal.Rptr.3d 465, 400 P.3d 29, 57 (2017). . See, e.g., Hashem Dezhbakhsh, et al.. Does Capital Punishment Have a Deterrent Effect? New Evidence from Post-moratorium Panel Data, 5 Am. L. & Econ. Rev. 344 (2003) (estimating that each execution results in eight to eighteen fewer murders); Cass R. Sunstein & Adrian Vermeule, Is Capital Punishment Morally Required? Acts, Omissions, and Life-Life Tradeoffs, 58 Stan. L. Rev. 703, 713 (2005) ("the recent evidence of a deterrent effect from capital punishment seems impressive”). But see John J. Donohue & Justin Wolfers, Uses and Abuses of Empirical Evidence in the Death Penalty Debate, 58 Stan. L. Rev. 791, 794 (2005) (the death penalty "is applied so rarely that the number of homicides it can plausibly have caused or deterred cannot be reliably disentangled from the large year-to-year changes in the homicide rate”). . Joanna M. Sheperd, Murders of Passion, Execution Delays, and the Deterrence of Capital Punishment, 33 J. Legal Stud. 283, 313 (2004) (executions appear to have a larger deterrent effect than do death sentences); Kenneth C. Land, et al., The Short-term Effects of Executions on Homicides: Deterrence, Displacement, or Both?, 47 Criminology 1009, 1038 (Oct. 20 09) (concluding that "evidence exists of modest, short-term reductions in the numbers of homicides in Texas in the months of or after executions").